Dieter LUCAS, Dana Lucas, Glendon Fraser, James Bisceglia, Kristen Bisceglia, Joseph DiPalo, Norman Mackay, Robert Taft, Elizabeth Pierson, Neil Pierson, Alfred Hebert, John Bradbury, Judith Bradbury, and Dr. Susan Grenell, Plaintiffs,

v.

The PLANNING BOARD OF THE TOWN OF LAGRANGE, the Zoning Board of Appeals of the Town of LaGrange, Joachim S. Ansorge, Town of LaGrange Planner and Zoning Administrator and Samuel Schaffer, Town of LaGrange Building Inspector, Dutchess County Cellular Telephone Company, Inc. d/b/a/ Cellular One, Orange County—Poughkeepsie M.S.A. § Limited Partnership d/b/a/ Bell Atlantic Mobile, Defendants.

No. 98 Civ. 0862(CLB).

United States District Court,
S.D. New York.

May 19, 1998.

John Holden Adams, Corbally, Gartland & Rappleyea, Poughkeepsie, NY, for Plaintiffs.

Ronald Blass, Van DeWater and Van De-Water, Poughkeepsie, NY, for Town of La-Grange

Christopher Fisher, Cuddy & Feder & Worby, White Plains, NY, for Dutchess County Cellular One.

Gordon Lang, Nixon Hargrave Devans & Doyle, Washington, DC, for Orange County–Poughkeepsie.

### MEMORANDUM & ORDER

BRIEANT, District Judge.

Presently before the Court for decision is (1) plaintiffs' motion for remand of this action to state court; (2) defendants' cross-motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6); and (3) defendants' oral cross-motion for a declaratory judgment to enjoin all present and future collateral attacks on the validity of a prior consent judgment entered by this Court. *See* Transcript and *see* Doc. No. 6 in *Orange County–Poughkeepsie M.S.A. § Limited Partnership, et al. v. McCluskey et al.,* 97 Civ. 8650 (S.D.N.Y.) (Brieant, J.) (hereinafter the *"BAM Action"*). The motions were heard and fully submitted on April 17, 1998, and decision was reserved. *See* Transcript. After considering the issues raised by these motions, the Court concludes: (1) that remand to state court would be inappropriate; (2) that plaintiffs' claims are without merit; and (3) that defendants' motion for a declaratory judgment must be granted. A permanent injunction shall issue enjoining all collateral attacks on the validity of this Court's Consent Judgment.

### Background

**A. Prior Proceedings: The *BAM Action***

In April of 1997, Orange County–Poughkeepsie M.S.A. § Limited Partnership d/b/a/ Bell Atlantic Mobile ("BAM") and Cellular One ("Cell–One") (collectively the "Phone Companies" or the "Companies") both applied independently to the Town of LaGrange for the necessary permits and approvals (the "Permits") to construct two separate telecommunications towers. *See BAM Action* Complaint at ¶ 28–¶ 29. BAM applied for the Permits necessary to erect a 125 foot tower at a site which it calls the Freedom Plains Site, located in the Town of La Grange in Dutchess County. Cell–One applied for the Permits required to erect a 180 foot tower at a different site nearby, also in the Town of LaGrange.

Both BAM and Cell–One are licensed to provide cellular telephone service by the Federal Communications Commission (the "FCC") under the Federal Communications Act of 1934, § 1 *et seq.,* 47 U.S.C.A. § 151 *et seq.,* as amended by the Federal Telecommunications Act of 1996, 47 U.S.C.A. § 332 (West 1998). That Act announces the federal policy of promoting the availability, "so far as possible, to all the people of the United States a rapid, efficient, nationwide, and worldwide wire and radio communications service with adequate facilities at reasonable charges, for the purpose of national defense, for the purpose of promoting safety of life and property through the use of wire and radio communication." 47 U.S.C. § 151.

At the time of the BAM and Cell–One applications, the only cellular facility existing in the Town of LaGrange was a single 150 foot tower, erected by BAM with the Town's approval in 1987, and located on Industry Street. *Id.* at ¶ 25, ¶ 26. The new BAM and Cell–One applications were based on objective radio frequency calculations which demonstrated that the cellular coverage provided by the existing tower was inadequate for the surrounding geographic area as a whole. *Id.* at ¶ 21, ¶ 27.

■ The Town Board, Planning Board, Zoning Board and Town Planner and Zoning Administrator (collectively the "Town") all were involved in considering the two new independent tower proposals. From the outset, the Town presumed that the Phone Companies applications would bring the New York State Environmental Quality Review Act ("SEQRA") into play. *See* Environmental Conservation Law ("ECL") § 8–0101 *et seq.* SEQRA requires local planning boards to consider the potential environmental impact of a proposed project before granting site plan approval, *see* 6 N.Y.C.R.R. § 617.1;

ECL 8–0103, subd. 7. The statutory scheme attempts to achieve this substantive goal by designating the public agency most significantly involved in a particular project as the "lead" agency and by obliging that body to go through a series of procedures intended to compel consideration of the environmental consequences of any determination which finally approves the project. The visual impact of a proposed project is one of the environmental factors that is properly considered within the SEQRA process. *See WEOK Broadcasting Corp. v. Planning Board of the Town of Lloyd,* 79 N.Y.2d 373, 583 N.Y.S.2d 170, 173, 592 N.E.2d 778 (1992); *see also* 6 NYCRR 617.2[b][1] (defining an "action" as including all "projects or physical activities, such as construction or other activities that may affect the environment by changing the use, *appearance* or condition of any natural resource or structure." (emphasis added)).

As early as possible in the SEQRA process, the "lead" agency, *see* ECL 8–0111, subd. 6, must determine whether an Environmental Impact Statement ("EIS") should be prepared with reference to the proposal submitted. *See* ECL 8–0109, subd. 4; 8–0111, subd. 6. This determination is made according to whether a contemplated action falls within the definitions of "Type I actions," "Type II actions," or "unlisted" actions. (6 NYCRR 617.6[a][1]). "Type II actions" are those which "have been determined not to have a significant impact on the environment or are otherwise precluded from environmental review." *See* 6 NYCRR 617.5[a]. If an action falls within the Type II category, the lead agency has "no further responsibilities" under the SEQRA regulations. *See* 6 NYCRR 617.6[a][i].

On the other hand, "Type I actions" are those that will likely have a significant adverse impact on the environment, and ultimately require compilation of an EIS. The consequence of an "action" falling within Type I, or of its being "Unlisted," is that an "environmental assessment form" must be compiled, see 6 NYCRR 617.6, and a determination made as to whether the action "may include the potential for at least one significant adverse environmental impact." *See* 6 NYCRR 617.7[a]. If the lead agency deter-

mines that that is the case, that agency issues a "positive declaration" and either the agency or the applicant—at the latter's option—must prepare a draft environmental impact statement ("DEIS"). *See* ECL 8–0109, subds. 2, 4; 6 N.Y.C.R.R. §§ 617.7.

If the draft statement is accepted by the agency "as satisfactory with respect to scope, content and adequacy," it is then circulated to any other agencies having an interest in the proposal, and "interested members of the public."(*see* ECL 8–0109, subds. 4, 5; 6 NYCRR 617.8[b], 617.10). After allowing a period for comment, the lead agency must prepare a final environmental impact statement ("FEIS") and circulate it in the same manner as the draft statement. *See* ECL 8–0109, subds. 4, 5, 6; 6 NYCRR 617.10[h]. Upon adoption of the proposal by the lead agency, it is required to make explicit written findings that (1) the requirements of SEQRA have been met, and (2) adverse environmental effects revealed in the EIS process will be minimized or avoided to the maximum extent possible. *See* ECL 8–0109, subd. 8; 6 NYCRR 617.9[c].

In this case, in response to the initial applications by BAM and Cell–One, the Town invoked its SEQRA obligations to indicate that its preference was for a single co-located tower on which both BAM and Cell–One would fix their antennae. After a period of consultation with all parties, the Phone Companies agreed to propose a single co-located tower ("the Tower") with a height of 180 feet at BAM's Freedom Plains Site.

In preparation for that proposal, BAM conducted a balloon test to ascertain the visual impact of constructing such a Tower. *See BAM Action* Complaint at ¶ 38. BAM also created a "visual study" which "included a cross section analysis of where the tower would be visible, five photographs from five key view points in the Town within computerized photo realistic simulations of the proposed 180′ foot tower, a viewshed map, identification of the distance from the tower to the key locations indicating the character of the visual impact ... and a description of the land uses in the areas where the tower would be visible." On the basis of this analysis, BAM concluded that "[a]ll significant views

[of the Tower] in the foreground range (0–1/4 mile) [would be] blocked by vegetation and/or topography." *BAM Action* Complaint at ¶ 95(b). The results of BAM's analysis of the visual impact of the Tower were submitted to the relevant Town authorities.

It appears that at some early point in the process, the Town determined to oppose the construction of the Tower under all circumstances. While BAM was preparing its analysis, the Town, unbeknownst to the Phone Companies, undertook to do its own independent study, which included a balloon test by the Town Engineer. The results of that test were written up in what was termed a "Visual Impact Analysis." At the October 21, 1997 hearing to consider whether to issue a positive declaration under SEQRA, a Town Engineer summarized the Visual Impact Analysis for the Town Planning Board and recommended that the Board adopt a positive SEQRA declaration. The Phone Companies had not been provided with a copy of the Visual Impact Analysis, and objected to its admission. Nevertheless, relying on the Analysis as its sole justifying evidence, the Town Planning Board issued a positive SEQRA declaration.

According to BAM, the Visual Impact Analysis was a "sham," which did not even "support the conclusions generated by the Planning Board[ ] and the Town Engineer." *BAM Action* Complaint at ¶ 86. In addition to issuing a positive SEQRA declaration, the Town adopted, pursuant to local law, a "moratorium" which became effective on September 19, 1997 and which suspended all Permits for telecommunications facilities without regard to the merits of the application (hereinafter the "Local Law Moratorium"). The Local Law Moratorium was apparently intended to be renewable on a continuos basis.

In response to the positive SEQRA declaration and the Local Law Moratorium, BAM initiated the *BAM Action* against the Town in this Court under Docket No. 97 Civ. 8650. Cell–One subsequently intervened. Together, the Companies sought mandamus relief pursuant to the Federal Telecommunications Act of 1996, 47 U.S.C.A. § 332 (West 1998), and an order compelling the Town defendants to issue all necessary Permits for the construction of the Tower. Essentially, the Phone Companies asserted, and it was apparent to this Court, that the Town had not complied with: (1) the Telecommunications Act's provision which requires local municipalities to act on a carrier's request for permission to place its facilities within a reasonable time, *see* 47 U.S.C. § 332(c)(7)(B)(ii); (2) the provision that a municipality must deny such permission only in writing and only where that determination is supported by substantial evidence, *see* 47 U.S.C. § 332(c)(7)(B)(iii); and (3) the provision that the Town may not enact regulations which have the effect of prohibiting personal wireless services. *See* 47 U.S.C. § 332(c)(7)(B)(II).[1] In addition, BAM asserted, and the Court agreed, that there was no justification or authority for the so-called Local Law Moratorium.

After this Court conducted a lengthy settlement conference between the parties on December 12, 1997, and after concessions

---

1. In pertinent part, the Telecommunications Act provides:

 (c)(7) Preservation of Local Zoning Authority.
 (A) General Authority. Except as provided in this paragraph, nothing in this chapter shall limit or affect the authority of a State or local government ... over decisions regarding the placement, construction, and modification of personal wireless service facilities.
 (B) Limitations.
 The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof—
 (I) shall not unreasonably discriminate among providers of functionally equivalent services; and

(II) shall not prohibit or have the effect of prohibiting the provision of personal wireless services. . . .
(ii) A State or local government or instrumentality thereof shall act on any request for authorization to place, construct, or modify personal wireless service facilities within a reasonable period of time after the request is duly filed with such government or instrumentality, taking into account the nature and scope of such request.
(iii) Any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence in a written record. . . .
47 U.S.C. § 332(c)(7).

were made by both sides, the parties resolved their differences and with the aid of this Court drafted a proposed consent judgment (the "Consent Judgment"). In its final form, the Consent Judgment modified the Phone Companies' "applications to the Planning Board and the Zoning Board ... to provide that the height of the tower .... shall be 129 feet" rather than the 180 feet originally proposed. In exchange, the Town agreed to exempt the Companies from the Local Law Moratorium.

In addition, the Consent Judgment provided that "as a reasonable consequence of the modifications of the [Tower] ... the Planning Board's 'positive declaration' under SEQRA, dated October 21, 1997, is revoked, and the Planning Board hereby issues a "negative declaration" under SEQRA in accordance with the terms thereof." *See* Consent Judgment at ¶¶ 3–4. On January 21, 1998, this Court approved the Consent Judgment thereby concluding the litigation. Thereafter, the Town issued to the Phone Companies the Permits necessary for construction of the Tower.

### B. The Instant Case

Plaintiffs in this case "are owners and residents of properties in the Town of LaGrange which are either adjacent to, in close proximity of, or within the viewscape of" the Tower site. They believe that the Tower will have an adverse effect on their property values. *See* Plaintiffs' Verified Petition (hereinafter the "Complaint") at ¶ 1, ¶ 45; *see also* Reply Affidavit of James Bisceglia at ¶¶ 3–4 [Doc. No. 23]. Apparently throughout the process associated with the Town's consideration of Phone Companies' original proposals, plaintiffs objected to the construction of *any* tower *anywhere* in the Town. *See* Complaint at ¶ 15. Plaintiffs attended the various Town meetings on the subject, and expressed their concerns in writing to various members of elected Town government. *Id.* at ¶ 16. According to plaintiffs, "[a]t all times during the public hearings and deliberations, the Planning Board and Zoning Board advised [them] and other members of the public that the review process of all [Phone Company] applications ... would be a deliberative process in which their concerns would receive full consideration." *Id.* at ¶ 17. Specifically, plaintiffs claim that they were assured by the Town that their "concerns would be addressed ... in the planning, zoning and SEQRA process." *Id.* at ¶ 16.

Plaintiffs contend that the Town replaced the positive SEQRA declaration with a negative declaration without "public hearing, comment or participation." *Id.* at ¶ 21c. According to plaintiffs, "the Town unilaterally decided—without any input from property owners who participated all along—that a tower would be built in the specifications and location directed by the Town and self interested cellular telephone providers." Plaintiffs' Reply Memorandum at 14 [Doc. No. 22]. The Town denies plaintiffs' assertions in this regard and contends that it did in fact hold a public hearing to discuss the merits of the Consent Judgment.

On January 20, 1998, plaintiffs filed a verified petition to initiate an Article 78 proceeding in New York Supreme Court, Dutchess County against the Town Defendants. That petition, which is now before this Court, asserts six causes of action. Causes of action (1) through (4) seek exactly the same relief: the issuance of "an order ... rendering all approvals and permits under the [Consent Judgment] illegal null and void." *Id.* at ¶ 32, ¶ 36, ¶ 43, and ¶ 50.

The first cause of action asserts that such an order is required, because by entering into the Consent Judgment the Town deprived plaintiffs of "due process of law by the denial to them of mandated forums for the consideration of the impact of the construction of towers such as BAM's on their property and neighborhoods." *Id.* at ¶ 29–¶ 32. The second cause of action contends that "[n]o provision of SEQRA permits the unilateral revocation by [the Town] of its positive declaration to facilitate the [Consent Judgment]." *Id.* at ¶ 33–¶ 36. The third cause of action contends that "the recission of the positive declaration was not supported by substantial evidence" and that at the time the Town rescinded it "no change of circumstances, except the existence of the legal proceedings constituting the BAM Action, existed." *Id.* at ¶ 37–¶ 43. The fourth cause

318

of action contends that before adopting the Consent Judgment, the Town "made no SEQRA analysis" and "had no public hearing in connection with said application," but instead "unlawfully agreed and conspired to subvert and suppress the planning process and the rights of [plaintiffs] to have the merits of their opposition and comment duly heard and considered." Thus, according to plaintiffs, "the entire settlement and all of its terms are illegal, affected by an error of law, the result of unlawful procedure, and arbitrary and capricious." *Id.* at ¶ 44–¶ 50.

Plaintiffs' two final causes of action are pled pursuant to 42 U.S.C. § 1983. The fifth cause of action contends that by adopting the Consent Judgment, the Town together with BAM and Cell–One "unlawfully under color of law agreed and conspired to subvert and suppress the planning process and the rights of [plaintiffs] to have the merits of their opposition duly heard and considered, denying [plaintiffs] both due process and equal protection." As a result of this denial, plaintiffs claim that they "have been deprived of the public forum provided by law and have and will continue to suffer irreparable harm and monetary damages including, but not limited to, reduction in property values .... in a substantial sum yet unascertained." *Id.* at ¶ 51–¶ 56. The sixth and final cause of action seeks attorneys fees and costs pursuant to 42 U.S.C. § 1988.

On February 6, 1997 the Town timely removed the plaintiffs' Article 78 proceeding to this Court. Thereafter, Cellular One and Bell Atlantic intervened as defendants to protect their interests in the Consent Judgment (collectively the Town, BAM and Cell–One will be referred to for convenience as the defendants). The motions presently before the Court followed.

### Discussion

#### A. Plaintiffs' Motion for Remand

■ Plaintiffs seek remand of this case on the grounds that removal was improper. The Court disagrees. "As a general matter, defendants may remove to the appropriate federal district court 'any civil action brought in a State court of which the district courts of the United States have original jurisdic-

tion.'" *City of Chicago v. International College of Surgeons,* 522 U.S. ——, 118 S.Ct. 523, 528, 139 L.Ed.2d 525 (1997) (quoting 28 U.S.C. § 1441(a)). The propriety of defendants removal in this case thus depends on whether the case originally could have been filed in federal court. *City of Chicago,* —— U.S. at ——, 118 S.Ct. at 528; *Caterpillar Inc. v. Williams,* 482 U.S. 386, 391–392, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987).

■ Plaintiffs' Complaint clearly raises a number of issues of federal law in the form of various federal constitutional challenges to the Town's agreement to the construction of the Tower. It is true that four of plaintiffs' six causes of action allege SEQRA violations, and as such arise under state law. *See* Plaintiffs' Mem. at 4. As the *City of Chicago* Court explained, however, "[e]ven though state law creates [a party's] causes of action, its case might still 'arise under' the laws of the United States if a well-pleaded complaint established that its right to relief under state law requires resolution of a substantial question of federal law." —— U.S. at ——, 118 S.Ct. at 528. Here, the complaint not only alleges violations of 42 U.S.C. § 1983, it also raises questions under the Telecommunications Act and this federal Court's Consent Judgment. Accordingly, the resolution of plaintiffs' claims clearly requires resolution of substantial questions of federal law. Removal was proper on that basis.

■ There is an independent basis for federal jurisdiction in the authority conferred by the All Writs Act. *See* 28 U.S.C. § 1651. That Act provides that federal courts "may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." It "authorizes a federal court in exceptional circumstances to issue such orders to persons 'who, though not parties to the original action or engaged in wrongdoing, are in a position to frustrate the implementation of a court order or the proper administration of justice, and encompasses even those who have not taken any affirmative action to hinder justice.'" *Yonkers Racing Corporation v. City of Yonkers,* 858 F.2d 855, 863 (2d Cir.1988) *cert. denied* 489 U.S. 1077, 109 S.Ct. 1527, 103 L.Ed.2d 833 (1989) (citations omitted).

Such "exceptional circumstances" arise where it becomes "necessary or appropriate to effectuate and prevent the frustration of orders [a court] has previously issued in its exercise of jurisdiction otherwise obtained." *Yonkers Racing,* 858 F.2d at 863 (quoting *United States v. New York Telephone Co.,* 434 U.S. 159, 172, 98 S.Ct. 364, 54 L.Ed.2d 376 (1977)).

■ That is precisely the situation we are confronted with here. Although plaintiffs complain that they were not parties to the *BAM Action,* their state court suit inherently seeks to frustrate implementation of the Consent Judgment ordered by this Court.[2] *See Yonkers Racing Corp.,* 858 F.2d at 863–64. Accordingly, if plaintiffs' suit is to be continued, under both 28 U.S.C. § 1441(a) and the All Writs Act, 28 U.S.C. § 1651, plaintiffs must continue it in the federal forum, and they must start in this Court. Plaintiffs' motion for remand is denied.

## B. Defendants' Motions

Having determined that this case is properly before the Court, we turn to defendants' cross-motions for dismissal of this case, and for a declaratory judgment enjoining all future collateral attacks on the Consent Judgment. Fed.R.Civ.P. 57 makes all declaratory judgment actions subject to the Federal Rules of Civil Procedure, and expressly requires that they be adjudicated "in accordance with these rules." *See* Charles A. Wright, Arthur R. Miller & Mary Kay Kane, 10A Federal Practice and Procedure § 2767, at 747 ("[t]he requirements of pleading and practice in actions for declaratory relief are exactly the same as in other civil actions."). Thus, as a threshold matter, we must determine whether Rule 56 or Rule 12 should govern defendants' motion for declaratory judgement.

Defendants have moved to convert their Rule 12 motion to one brought pursuant to Rule 56, and have submitted some "preliminary discovery" in support of their arguments. Rule 12(b)(6) forbids consideration of material outside the complaint unless the court converts the motion to dismiss into a motion for summary judgment under Rule 56. Accordingly, the Court "must either disregard such material or give the parties notice that the motion is being converted into one for summary judgment and permit the parties to submit evidence accordingly." *Kopec v. Coughlin,* 922 F.2d 152, 155–56 (2d Cir.1991). With respect to the "preliminary discovery" submitted by defendants, the Court elects the first option, as the motions are presently before us, and while plaintiffs have had notice of the possibility of conversion to a Rule 56 motion, they have not yet had full discovery.

At the same time, however, the Court recognizes that Rule 12 does not require us to disregard the facts underlying the Consent Judgment. As evidenced by their Complaint, plaintiffs are fully familiar with those facts, which they themselves placed at issue, and which in any case are undisputed. Accordingly, the Court will consider those facts in assessing the merits of plaintiffs' claims. To the extent that defendants' motion to convert seeks admission of evidence beyond the facts underlying the Consent Judgment, that motion is denied as unnecessary.[3] Even accepting all of plaintiffs' factual allegations as true, the Court is satisfied that under Rule 12(b)(6), plaintiffs "can prove no set of facts in support of his claim which would entitle [them] to relief" in the nature of a collateral attack on the Consent Judgment.

---

**2.** For this reason, the Court declines to address plaintiffs' contention that the Court should abstain from this case under *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) and its progeny. Again, plaintiffs' case inherently implicates the Consent Judgment ordered by this Court, rendering questions of *Younger* abstention immaterial.

**3.** For example, the Town contends that plaintiffs have failed to establish SEQRA standing under New York law because they have not demonstrated an "injury in fact" which falls "within the zone of interest protected by the statute." Town's Memo. at 5 (quoting *Glen Head—Glenwood Landing Civic Council v. Town of Oyster Bay,* 88 A.D.2d 484, 453 N.Y.S.2d 732 (2d Dep't 1982)). In support of this contention, the Town has offered proof in the form of a zoning map, showing that the homes of the individual plaintiffs are so remote from the Tower as to place them outside the zone of injury. The Court declines to consider this material as it is not properly within the scope of the present inquiry.

*Conley v. Gibson*, 355 U.S. 41, 46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

### 1. *The Merits of Plaintiffs' Claims*

Essentially, plaintiffs advance four discrete claims. They assert that in adopting the Consent Judgment, the Town: (a) failed to adhere to the procedures required by SEQRA; (b) violated the substance of SEQRA; (c) deprived them of due process in violation of 42 U.S.C. § 1983; and (d) denied them equal protection in violation of 42 U.S.C. § 1983. In addition to addressing plaintiffs' federal constitutional claims, this Court now exercises its supplemental jurisdiction to consider plaintiffs' state law claims arising under SEQRA. *See* 28 U.S.C. § 1367.

#### (a) *Procedural SEQRA Claims*

■ Plaintiffs first claim is that the Consent Judgment was endorsed by the Town "in violation of [the] lawful procedure" established by SEQRA. *See* Complaint at ¶ 25, ¶ 48. This claim is without merit. It is true that under New York law, lead agencies, such as the Town in this case, must adhere to SEQRA procedure to the "fullest extent possible." ECL 8–0103[6]. As New York's Court of Appeals has stated, "it is clear that strict, not substantial compliance [with SEQRA's procedural mechanisms] is required." *King v. Saratoga County Board of Supervisors*, 89 N.Y.2d 341, 346, 653 N.Y.S.2d 233, 675 N.E.2d 1185 (1996). We assume for purposes of our analysis that the Town violated SEQRA's procedural requirements in adopting the Consent Judgment. The Complaint asserts, and the Court accepts as true for present purposes, that among other things the Town never formally designated itself as "lead agency,"[4] and never prepared an official EIS to reflect its assessment of the environmental impacts of withdrawing its positive declaration to allow construction of the Tower. *See, e.g.,* Complaint at ¶ 15, ¶ 35.

The Town's alleged failures in that regard are not relevant in the circumstances of this case. The procedural requirements of SEQRA are only applicable to "Type I actions," and do not apply to Type II actions. *See* NYCCR Section 617.6(a)(1)(i). The SEQRA regulations provide a list of Type II actions "which have been determined not to have a significant impact on the environment or are otherwise precluded from environmental review." NYCCR 617.5(c). Specifically, included in this list are the "actions ... of any court." NYCCR 617.5(c)(37).

Plaintiffs contend that the Consent Judgment in this case does not represent an "action" of the Court. They claim that the Consent Judgment "must be viewed from a SEQRA perspective for exactly what it was—a private stipulation disguised in a consent judgment .... The parties requested a consent judgment, the Court did not direct one." Plaintiffs Mem. at 13.

■ This characterization is inaccurate. All courts have an obligation to "craft a settlement" in lawsuits brought before them, in order to help all parties avoid the expense, delay and fool discovery (that is to say useless discovery) associated with modern litigation. *In re Baldwin–United Corp.,* 770 F.2d 328, 337 (2d Cir.1985). Courts' endeavors in this regard are entitled to considerable deference. *See G. Heileman Brewing Co., Inc. v. Joseph Oat Corp.,* 871 F.2d 648 (7th Cir.1989) (magistrate judge did not abuse his discretion when he ordered corporate representatives of litigants to attend pretrial settlement conference, though such representatives would have been forced to travel from New Jersey to Wisconsin to participate).

■ Mindful of these considerations, this Court conducted a lengthy settlement confer-

---

**4.** Plaintiffs' challenge to the Town's assumption of lead agency status is of little practical significance. The Town was clearly the agency "principally responsible for undertaking, funding or approving" the proposed action, 6 NYCRR 617.2[u]; ECL 8–0111[6], and was quite obviously in the best position to carry out the lead agency's "continuing duty to evaluate new infor-

mation relevant to the environmental impact of its actions." *Glen Head–Glenwood Landing Civic Council v. Town of Oyster Bay,* 88 A.D.2d 484, 453 N.Y.S.2d 732 (2d Dep't 1982) (citations omitted). In any case, no alternative agency, beyond Town related political entitities, apparently desired to assume lead agency status.

ence in the *BAM Action*. That conference served to enlighten the Town as to the policies underlying the Federal Telecommunications Act, and clarified for the Town that their opposition to the Tower rested on very tenuous legal grounds. At the same time, the Phone Companies came to recognize the commercial advantages to co-locating their antennae on a single tower as requested by the Town. The Companies were also enlightened as to the practical consequences and litigation risks associated with insisting on a tower height that appeared unreasonable. In short, this Court has an institutional interest in the Consent Judgment, which extends far beyond the mere fact that it was "so-ordered." The Consent Judgment represents a fair agreement, with concessions made on both sides, which the Court helped the parties and their attorneys craft, and which the Court formally and substantively endorsed. As such, the Consent Judgment clearly constitutes an "action" of the Court.

As an "action ... of any court," the Consent Judgment is exempt from SEQRA. *See* NYCCR 617.5(c)(37). This precludes plaintiffs from asserting a claim based on the Town's failure to adhere to SEQRA's procedural requirements. Indeed, partially relying on the exemptive authority of NYCCR 617.5(c)(37), our Court of Appeals has held "that the requirements of SEQRA were satisfied in all respects," notwithstanding alleged procedural violations, where public housing sites were condemned to enforce compliance with a federal court's desegregation order. *Yonkers Racing Corp. v. City of Yonkers*, 858 F.2d 855, 863 (2d Cir.1988), *cert. denied*, 489 U.S. 1077, 109 S.Ct. 1527, 103 L.Ed.2d 833 (1989).[5] Indeed, in constructing the new federal courthouse at 500 Pearl Street in Manhattan, this Court exempted the City of New York from complying with SEQRA by condemning the land in a legal action rather than negotiating for a deed.[6]

 In any case, plaintiffs may not state a claim for technical violations of SEQRA's procedural requirements, where, as in the circumstances of this case, those requirements are preempted by federal law in the form of the Federal Telecommunications Act. Although the Telecommunications Act "does not completely preempt the authority of state and local governments to make decisions regarding the placement of wireless communications facilities within their borders," *BellSouth Mobility, Inc. v. Gwinnett County*, 944 F.Supp. 923, 927 (N.D.Ga.1996), it quite clearly preempts any state regulations "which conflict with its provisions." *Sprint Spectrum L.P. v. Town of Easton*, 982 F.Supp. 47, 50 (D.Mass.1997); *see also Paging, Inc. v. Board of Zoning Appeals for County of Montgomery*, 957 F.Supp. 805, 808 (W.D.Va.1997) (federal interest in wireless communications takes priority over state zoning authority).

One of the Act's provisions, Section 332(c)(7)(B)(i)(II), expressly forbids a local municipality from "prohibit[ing] or hav[ing] the effect of prohibiting the provision of personal wireless services." Another provision, Section 332(c)(7)(B)(ii), requires local municipalities to act on a carrier's request for permission to place its facilities within a reasonable time. As confirmed by the Act's legislative history, these provisions were quite obviously designed to break down the barriers to the development of a telecommunications infrastructure. Cong. Rec. H1151 (Feb. 1, 1996) (statement of Rep. Markey). As such, they reflect the Act's "antiregulatory and antibureaucratic ... philosophy." *Id.* H1161 (statement of Rep. Oxley). More specifically, these provisions implement Congress' intent "to stop local authorities from keeping wireless providers tied up in the

**5.** It is true that one New York court has distinguished *Yonkers Racing* on its facts, and has held that a consent decree may not be used as a "bootstrap ... for escaping SEQRA's mandates." *Matter of Doremus v. Town of Oyster Bay*, N.Y.L.J., January 28, 1998, page 29 col. 2 (Sup. Ct. Kings Co.1998). In this Court, however, our Court of Appeals' decision in *Yonkers Racing* remains controlling.

**6.** While a federal courthouse is a "smokeless industry" that confers substantial benefits on a community, vocal local opponents to the 500 Pearl Street project were concerned that the new courthouse would cast a shadow. That was a typical SEQRA issue.

hearing process" through invocation of state procedures, moratoria or gimmicks. *Sprint Spectrum L.P.*, 982 F.Supp. at 50 (quoting *Westel–Milwaukee Co. v. Walworth County Park and Planning Comm'n*, 205 Wis.2d 244, 556 N.W.2d 107 (App.1996)).

Tying up BAM and Cell–One in the "hearing process" is precisely what plaintiffs' invocation of SEQRA's procedures seeks to achieve in this case. Based on allegations of technical breaches of those procedures in the process which culminated in the Consent Judgment, plaintiffs seek an order rendering that Judgment null and void. Such relief would return BAM and Cell–One to the hearing process so that all parties could jump through the various costly and dilatory hoops required by SEQRA. Although that course of action may in an abstract way comport with the strict compliance philosophy underlying SEQRA, *see King*, 89 N.Y.2d at 348, 653 N.Y.S.2d 233, 675 N.E.2d 1185, it would be in direct conflict with the general philosophy and specific provisions of the Telecommunications Act. *See* 47 U.S.C. §§ 332(c)(7)(B)(i)(II); 332(c)(7)(B)(ii); *Sprint Spectrum L.P.*, 982 F.Supp. at 49. As such, it would be invalid under the Supremacy Clause. *See* U.S. Const. Art. VI.

BAM and Cell–One applied for the Permits necessary to construct their telecommunications facilities in April of 1997. In response, the Town engaged in a lengthy series of delaying tactics, which included adopting the patently invalid Local Law Moratorium, a stopper which was subject to continuous renewal. Finally over nine months later in January of 1998, after extracting considerable concessions from the Phone Companies in the course of judicially sponsored settlement talks, the Town agreed, and this Court ordered, that all necessary Permits would be issued for construction of the smaller, joint Tower. *See* Consent Judgment. This Court will not vacate that order now, simply because it is alleged that the Town was unable to, or did not, adhere precisely to its own state's procedures. To do so, would be to allow every locality in New York to rely on SEQRA to frustrate the clear mandates of the Telecommunications Act.

In sum, the Court holds that plaintiffs' claims founded on the Town's alleged departures from SEQRA procedure are without merit. Such departures were required by the Consent Judgment, which is exempted from SEQRA.[7] In addition, in the circumstances of this case the procedures relied upon by plaintiffs are preempted by the Federal Telecommunications Act.

### (b) Substantive SEQRA Claims

■ In addition to its procedural requirements, SEQRA also imposes substantive obligations. Specifically, SEQRA requires that the lead agency "act and choose alternatives which, consistent with social, economic and other essential considerations, to the maximum extent practicable, minimize or avoid adverse environmental effects." ECL 8–0109[1]. While literal compliance with SEQRA's procedural requirements is necessary, *see King*, 89 N.Y.2d at 348, 653 N.Y.S.2d 233, 675 N.E.2d 1185, New York courts allow local agencies considerable latitude in the exercise of discretion for substantive environmental decisions. As explained by New York's Court of Appeals:

> Judicial review of a lead agency's SEQRA determination is limited to whether the determination was made in accordance with lawful procedure and whether, substantively, the determination "was affected by an error of law or was arbitrary and capricious or an abuse of discretion." In assessing an agency's compliance with the substantive mandates of the statute, the courts must "review the record to determine whether the agency identified the relevant areas of environmental concern, took a 'hard look' at them, and made a 'reasoned elaboration' of the basis for its determination." An agency's compliance with its substantive SEQRA obligations is governed by a rule of reason and the extent to which particular environmental factors are to be considered varies in accordance with the circumstances and nature of particular proposals. Similarly, agencies have considerable latitude evaluating environmental effects and choosing be-

---

**7.** We are cited to nothing in SEQRA which re- quires a party to litigate a case to the bitter end.

tween alternative measures. While judicial review must be meaningful, the courts may not substitute their judgment for that of the agency for it is not their role to "weigh the desirability of any action or [to] choose among alternatives." [8]

*Akpan v. Koch,* 75 N.Y.2d 561, 570, 555 N.Y.S.2d 16, 554 N.E.2d 53 (1990) (quotations and citations omitted).

In this case, the substantive decision challenged by plaintiffs is the Town's agreement to rescind its positive SEQRA declaration to issue the Permits necessary for construction of the reduced, joint Tower at the BAM site. Plaintiffs claim that (1) they are particularly "aggrieved by the location, appearance, and affects" of the Tower, presumably to a greater extent than other Town residents because they are in closer proximity to it, *see* Complaint at ¶ 26; (2) that the Town "never considered the use of alternate, less obtrusive technology for either the BAM or Cellular One Applications," *id.* at ¶ 28; (3) that the Town did not consider or cite any change in circumstances as justification for rescinding the positive SEQRA declaration, *id.* at ¶ 38; and finally (4) that the Town's "recission of the positive declaration was not supported by substantial evidence." *Id.* at ¶ 41. Based on these assertions, plaintiffs contend that the Town's agreement to the Consent Judgment was "arbitrary [and] capricious," in violation of SEQRA's substantive requirements.

■ The Court disagrees. Again, as explained above the Consent Judgment and the Town's agreement to it represent "actions . . . of any court," which as "Type II actions" are specifically "precluded from environmental review" under SEQRA. *See* NYCCR 617.5(c); 617.5(c)(37). In any case, the Court is satisfied that though the Town may not have strictly complied with SEQRA's procedural mechanisms, it did identify "the relevant areas of environmental concern, took a 'hard look' at them, and made a 'reasoned elaboration' of the basis for its determination." *Akpan,* 75 N.Y.2d at 570, 555 N.Y.S.2d 16, 554 N.E.2d 53 (quotation omitted).

Even before initiation of the *BAM Action,* the Town had identified the potentially adverse "visual impacts of situating the alternative tower proposals, of the respective heights [proposed by BAM and Cell–One], on a ridgeline in a rural and rustic portion of the municipality." *See* Town's Answer in *BAM Action,* Doc. 4 at ¶ 49 in 97 Civ. 8650. That the Town took a "hard look" at these potentially adverse effects is evidenced by the fact that it succeeded, with the aid of this Court, in prevailing upon BAM and Cell–One to change their original proposals from two towers of 125 and 180 feet respectively, to a single co-located tower of 129 feet. Thus, despite having very little bargaining leverage [9] the Town "to the maximum extent practicable, minimize[d] . . . [the] adverse environmental effects," of the original tower proposals. *See* ECL 8–0109[1].

The Town also provided a "reasoned elaboration" for its action. Although the form of the Consent Judgment does not comport with SEQRA's procedural requirements, from a substantive perspective the Judgment specifically states that "as a reasonable consequence of the modifications of the [Tower] . . . the Planning Board's 'positive declaration' under SEQRA, dated October 21, 1997, is revoked, and the Planning Board hereby issues a "negative declaration" under SEQRA in accordance with the terms thereof." *See* Consent Judgment at ¶¶ 3–4.

**8.** It should also be noted that under New York law, cellular providers are considered "public utilities," and are entitled to wider zoning latitude in order to provide their public services. *See Cellular Telephone Co. v. Rosenberg,* 82 N.Y.2d 364, 604 N.Y.S.2d 895, 624 N.E.2d 990 (1993).

**9.** Had litigation arisen under the Telecommunications Act over the Town's opposition to the original two 125 and 180 foot towers, BAM and Cell–One might well have prevailed. Both the Complaint and plaintiffs' papers submitted for

purposes of this motion ignore the impact of the Telecommunications Act on the Town's decision to agree to the Consent Judgment. Indeed, one explanation for plaintiffs' election to sue, rather than to congratulate, the Town for its efforts with respect to the Tower, is that plaintiffs are simply unaware or unwilling to acknowledge the practical limitations imposed by the Act on the Town's ability to prohibit, or otherwise circumscribe, the development of telecommunications facilities which serve the public.

Finally, while plaintiffs may object to the specific placement of the Tower (i.e. its proximity to their properties relative to the properties of other Town residents), SEQRA inherently obliges the Town only to minimize to the greatest extent possible the aesthetic effects of the Tower for the municipality as a whole. *See* ECL 8-0109[1]. In any case, "the courts may not substitute their judgment for that of the agency for it is not their role to 'weigh the desirability of any action or [to] choose among alternatives.'" *Akpan,* 75 N.Y.2d at 570, 555 N.Y.S.2d 16, 554 N.E.2d 53 (quotation omitted).

For these reasons, the Court concludes that plaintiffs' claim for substantive violations of SEQRA has no merit.

#### (c) Substantive and Procedural Due Process

"To state a substantive due process claim a party must first establish that he had a valid 'property interest' in the benefit that was entitled to constitutional protection at the time he was deprived of that benefit." *Zahra v. Town of Southold,* 48 F.3d 674, 680 (2d Cir.1995). "Property interests are created, and their dimensions defined by state law." *RR Village Ass'n, Inc. v. Denver Sewer Corp.,* 826 F.2d 1197, 1201 (2d Cir.1987). "It is well settled in this Circuit that a constitutionally protected property interest in land use regulation arises only if there is an entitlement to the relief sought by the property owner." *Gagliardi v. Village of Pawling,* 18 F.3d 188, 192 (2d Cir.1994) (citing *RRI Realty Corp. v. Incorporated Village of Southampton,* 870 F.2d 911, 918 (2d Cir.), *cert. denied,* 493 U.S. 893, 110 S.Ct. 240, 107 L.Ed.2d 191 (1989)).

Plaintiffs' attempts to define the dimensions of the substantive due process rights implicated by this case lack clarity. It appears to the Court essentially that the substantive relief sought here is the right to protect that portion of plaintiffs' property values which derives from enjoying unobstructed views from the premises. As plaintiffs put it, "the property interests alleged to be diminished in value are ... protected" rights. *See* Plaintiffs' Memo. at 13. Yet, plaintiffs readily concede that under SEQRA that they "have no property interest [in] the absolute prohibition of towers," and that "they claim none." *See* Plaintiffs' Reply Mem. at 19.

In addition, plaintiffs do not even attempt to claim a state common law entitlement to that portion of their property values which will be allegedly diminished by the visual impact of the Tower. Nor could they. The English doctrine of "Ancient Lights" has been universally repudiated in this nation. Accordingly, American courts, including those in New York, recognize an absolute right to build on one's property regardless of the impact on the light or views of adjacent landowners. Thus, plaintiffs have no cognizable legal entitlement under New York Law to the "views" which purportedly enhance their property values. *See Parker v. Foote,* 19 Wend. 309 (N.Y.1838). In sum, to the extent that plaintiffs are asserting a substantive due process claim, that claim is without merit.

Plaintiffs also seek to assert a claim for deprivation of procedural due process arising from the Town's failure to follow SEQRA procedures. "The deprivation of a procedural right to be heard, however, is not actionable when there is no protected right at stake." *Gagliardi,* 18 F.3d at 193 (citing *Azizi v. Thornburgh,* 908 F.2d 1130, 1134 (2d Cir.1990); *New Burnham Prairie Homes, Inc. v. Village of Burnham,* 910 F.2d 1474, 1479 (7th Cir.1990)). As our Court of Appeals has repeatedly stated, "if state law makes the pertinent official action discretionary, one's interest in a favorable decision does not rise to the level of a property right entitled to procedural due process protection." *Gagliardi,* 18 F.3d at 193 (quoting *RR Village Ass'n, Inc. v. Denver Sewer Corp.,* 826 F.2d 1197, 1201-02 (2d Cir.1987)).

According to plaintiffs, the Town's initial issuance of a positive declaration conferred upon them a right to "a public hearing" on the environmental impacts of the Tower. Complaint at ¶ 21(a). This is so, they claim, because "[a]s a matter of law, no provision exists under SEQRA permitting a recission of a positive declaration once that declaration has been made." *Id.* at ¶ 42; *see* ¶ 35.

"[T]he total elimination of this state-protected process is the wrong complained of .... SEQRA is designed to encourage public participation in the review process... This entire process *guaranteed* to the public, was, however, completely eliminated by the [Town's] illegal settlement agreement. Thus the § 1983 claim is not based on preventing towers, but upon enforcing rights assured by state law." *See* Plaintiffs' Reply Mem. at 19–20 (emphasis added).

The underlying question presented by these assertions is whether SEQRA confers upon plaintiffs a right to a hearing on whether the Town should have agreed to the Consent Judgment. This is a novel question which has yet to be considered by any court interpreting New York law. Of course for present purposes, our analysis of this question will begin with the assumption that no hearing was in fact held, notwithstanding the Town's assertions to the contrary.

Plaintiffs repeatedly assert that they had a right to a hearing because "[a]s a matter of law, no provision exists under SEQRA permitting a recission of a positive declaration once that declaration has been made," *see* Complaint at ¶ 42, ¶ 35. Yet, the converse is also true. Plaintiffs have not offered, nor has independent research uncovered, any authority for the specific proposition that an unrevocable state protected right to a hearing arose automatically once the Town issued its positive declaration. Indeed, the SEQRA regulations' express exemption for "actions ... of any court," indicates that no such right could have attached in the circumstances of this case. *See* NYCCR 617.5(c); 617.5(c)(37).

Plaintiffs reliance on *Merson v. McNally,* 90 N.Y.2d 742, 665 N.Y.S.2d 605, 688 N.E.2d 479 (1997), for the assertion that such a right has been recognized by New York's Court of Appeals is misplaced. *See* Plaintiffs Memorandum at 12. In that case, the court merely observed that "[t]he environmental review process was not meant to be a bilateral negotiation between a developer and lead agency but, rather, an open process that also involves other interested agencies and the pub-

lic." *Merson,* 90 N.Y.2d at 753, 665 N.Y.S.2d 605, 688 N.E.2d 479. As a general proposition, this is undoubtedly true. As noted in *Merson,* SEQRA's procedures, principally the compilation of the EIS, provide "a means for agencies, project sponsors and the public to systematically consider significant adverse environmental impacts, alternatives and mitigation." *Id.* at 751 n. 3, 665 N.Y.S.2d 605, 688 N.E.2d 479 (quoting 6 NYCRR 617.2[n]).

Yet these general observations do not reflect recognition of a specific *right* to participate in a public hearing. Instead, they merely reaffirm that SEQRA calls for public consideration of the environmental issues associated with a proposed project. The other cases cited by plaintiffs articulate no more than the same general directive. *See Matter of WEOK v. Planning Board of Town of Lloyd,* 79 N.Y.2d at 385, 583 N.Y.S.2d 170, 592 N.E.2d 778; *West Branch Conserv. Ass'n v. Planning Board of Town of Clarkstown,* 207 A.D.2d 837, 840, 616 N.Y.S.2d 550 (2d Dep't.1994).

The process by which the Town settled the *BAM Action* comported in all respects with this general directive. As plaintiffs' Complaint repeatedly asserts, throughout the SEQRA process they consistently voiced their opposition to the Phone Companies' proposals. *See, e.g.,* Complaint at ¶¶ 15–16. Accordingly, the Town was well aware of their concerns on the issue, and obviously considered those concerns in agreeing to the Consent Judgment. This general consideration, rather than a specific hearing, is all that New York law requires. *Merson,* 90 N.Y.2d at 753, 665 N.Y.S.2d 605, 688 N.E.2d 479. As such, no right to a hearing arose in the circumstances of this case.

In sum, in the absence of any direct authority on the issue, this Court is unwilling to recognize that an unrevocable right to a hearing arose after the issuance of the positive SEQRA declaration, or that the declaration itself was unrevocable. In the absence of such a right, plaintiffs cannot assert a claim for a deprivation of procedural due process.[10] Accordingly, that claim is found to be without merit.

10. The Court notes that even if New York law would recognize a right to a hearing in this case,

## (d) Equal Protection Claim

Plaintiffs final claim is that the Town together with Bell Atlantic and Cellular One, "unlawfully" deprived them of "equal protection" in adopting the Consent Judgment. *See* Complaint at ¶ 52. The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (citing *Plyler v. Doe,* 457 U.S. 202, 216, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982)).

■ Although never expressly stated, the court assumes that plaintiffs' equal protection claim arises from the Town's issuance of Permits which allowed construction of the Tower in a location which affects their property values to a greater extent than those of other Town residents. This is essentially akin· to a claim for selective enforcement, which is established where:

(1) the person, compared with others similarly situated, was selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person.

*Zahra,* 48 F.3d at 683 (citing *FSK Drug Corp. v. Perales,* 960 F.2d 6, 10 (2d Cir.1992); *LaTrieste Restaurant & Cabaret Inc. v. Village of Port Chester,* 40 F.3d 587, 590 (2d Cir.1994); *Terminate Control Corp. v. Horowitz,* 28 F.3d 1335, 1352 (2d Cir.1994); *LeClair v. Saunders,* 627 F.2d 606, 608 (2d

Cir.1980), *cert. denied,* 450 U.S. 959, 101 S.Ct. 1418, 67 L.Ed.2d 383 (1981)).

■ Even accepting as true plaintiffs' assertion that they were selectively treated relative to other Town residents (and that assertion is never expressly made), plaintiffs have failed to allege that such treatment was motivated by an unconstitutional animus or a bad faith intent to injure. Such an allegation would plainly be unwarranted. It simply cannot be said that the Town was motivated by an intention to discriminate on the basis of unconstitutional considerations, or by a bad faith intent to injure plaintiffs. Instead, the Town's decision to issue the Permits obviously was made pursuant to the Consent Judgment, which reflected a very favorable settlement for all Town residents, including plaintiffs. Accordingly, plaintiffs' equal protection claim is also without merit.

## 2. Declaratory Judgment

Although this decision disposes of plaintiffs' claims, there remains the distinct possibility that some other dissatisfied group of Town residents will endeavor to raise these same NIMBY issues in a future proceeding, directed against the same Town. For that reason, the Court has considered the Town's motion for a declaratory judgment, and has concluded, for the· reasons set forth below, that that motion should be granted. All collateral attacks on the validity of this Court's Consent Judgment, including plaintiffs' claims in this case, are barred by principles of res judicata. A permanent injunction shall issue to that effect.

■ Res judicata, which now operates as claim preclusion, bars subsequent litigation of a claim where the prior suit produced a

---

. the· deprivation of that right would be of little practical significance. As discussed above, there can be little doubt that under the Federal Telecommunications Act ultimately the Permits for some sort of tower would have been issued, whether on consent, or after litigation. Thus, even if plaintiffs were deprived of procedural due process, they would only be entitled to nominal damages. *Irish Lesbian and Gay Organization v. Giuliani,* 143 F.3d 638, 651 (2d Cir.1998) (only nominal damages are available in actions alleging a deprivation of constitutionally protected rights, where there is no actual injury) (citing *Carey v. Piphus,* 435 U.S. 247, 266, 98 S.Ct.

1042, 55 L.Ed.2d 252 (1978) (holding that students who had been suspended from school without a hearing could receive only nominal damages if the jury found they would have been suspended even if their procedural due process rights had not been violated)); *see also Cifarelli v. Village of Babylon,* 894 F.Supp. 614, 622 (E.D.N.Y.1995) ("Even though plaintiff's right to procedural due process was violated by defendants ... if defendants can establish that [plaintiff] would have been terminated even after a proper pre-termination hearing, [plaintiff] will be entitled to an award of only nominal damages." *aff'd.,* 93 F.3d 47 (2d Cir.1996))

final judgment on the merits and involved "the same parties or their privies and the same cause of action." *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 326 n. 5, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979); *Montana v. United States,* 440 U.S. 147, 153, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979). In this case, there can be no dispute that the BAM litigation produced a final judgment on the merits: consent decrees—such as the Consent Judgment at issue here—are accorded the weight of all other final judgments. *See Rufo v. Inmates of Suffolk County Jail,* 502 U.S. 367, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992). Nor can it be disputed that the prior *BAM Action* involved the same claims as the claims in this suit or some future suit brought to contest the issuance of the Permits necessary for the construction of the Tower. What remains at issue is the identity of the parties to the two cases. Since neither plaintiffs here, nor the residents of the Town generally, were parties of record in the *BAM Action,* we must determine if privity exists between the Town and its residents, including plaintiffs.

██ As the Supreme Court has recognized, the term "privity" as interpreted within the res judicata context "is now used to describe various relationships between litigants that would not have come within the traditional definition of that term." *Richards v. Jefferson County,* 517 U.S. 793, 798, 116 S.Ct. 1761, 1766, 135 L.Ed.2d 76 (1996). Thus, while there are due process limitations on the breadth to which the concept of privity can be extended for res judicata purposes, "[t]he Second Circuit has rejected the argument that literal privity is required in order to obtain preclusive effect," and it is clear that formal participation in litigation—either individually or by a representative vested with express authority—are not pre-requisites to barring successive litigation. *Phillips v. Kidder Peabody & Co.,* 750 F.Supp. 603, 607 (S.D.N.Y.1990) (citing *Alpert's Newspaper Delivery v. New York Times,* 876 F.2d 266, 270 (2d Cir.1989); *Amalgamated Sugar v. NL Industries,* 825 F.2d 634, 640 (2d Cir.), *cert. denied,* 484 U.S. 992, 108 S.Ct. 511, 98 L.Ed.2d 511 (1987) (citation omitted)).

██ Instead, res judicata may apply where the party to the prior proceeding was what has been characterized a 'virtual representative' of the party to the succeeding litigation. *Chase Manhattan Bank, N.A., v. Celotex Corp.,* 56 F.3d 343, 345 (2d Cir.1995). As the Supreme Court has stated: "in limited circumstances," res judicata may bar the claims of non-parties to a prior proceeding where they were "adequately represented by someone with the same interests who [was] a party." *Richards,* 116 S.Ct. at 1767 (quoting *Martin v. Wilks,* 490 U.S. 755, 762 n. 2, 109 S.Ct. 2180, 104 L.Ed.2d 835 (1989)(other citations omitted)).

██ To assess whether a state entity "adequately represented" the interests of its non-party citizens in a prior litigation, courts have generally looked to the concepts underlying the doctrine of *parens patrie.* Under that doctrine, the state has standing to sue as a representative of its citizens only where it can allege injuries to a "quasi-sovereign interest," or to put it another way, where it can allege injuries to interests which "affect[ ] her citizens at large." *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,* 458 U.S. 592, 607, 102 S.Ct. 3260, 73 L.Ed.2d 995 (1982); *Badgley v. City of New York,* 606 F.2d 358, 365 (2d Cir.1979). On the other hand, a state may not sue to assert the individual rights of its citizens. *Alfred L. Snapp,* 458 U.S. at 600, 102 S.Ct. 3260.

Applying this distinction to the res judicata context, courts have held consistently that claims by private plaintiff-citizens may be precluded by prior state litigation to the extent that such claims do not seek redress for private interests or individual rights above and beyond the general public interest asserted by the state in the prior proceeding. *Compare, e.g., City of Tacoma v. Taxpayers of Tacoma,* 357 U.S. 320, 340–41, 78 S.Ct. 1209, 2 L.Ed.2d 1345 (1958) (holding that where State had appeared in proceedings to object to issuance of dam license, taxpayers could not subsequently contest validity of bond issued by city to pay for construction of dam, because taxpayers "in their common public rights as citizens of the State, were represented by the State and, like it, were bound by the judgment.") and *Washington v. Fishing Vessel Ass'n,* 443 U.S. 658, 692–93 n. 32, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979)

(same); *with Lockport v. Citizens for Community Action at Local Level, Inc.*, 430 U.S. 259, 263 n. 7, 97 S.Ct. 1047, 51 L.Ed.2d 313 (1977) (voting rights challenge by county residents not barred by county's prior suit); *Martin v. Wilks*, 490 U.S. 755, 762, 109 S.Ct. 2180, 104 L.Ed.2d 835 (1989) (holding that white fire-fighters, who had not intervened in a prior employment discrimination proceeding in which an affirmative action consent decree had been entered, could nevertheless challenge employment decisions made pursuant to those decrees because "[a] judgment or decree among parties to a lawsuit resolves issues as among them, but it does not conclude the rights of strangers to those proceedings." (*superseded by statute*, 1991 Civil Rights Act § 108, 42 U.S.C. § 2000e-2(n))); *see also* 18 Moore's § 131.40[3][e][B], p. 131–50 ("individuals asserting violations of their civil rights frequently are permitted to bring private actions despite past or pending actions by the government addressing the same acts or practices by the defendants."); *Richards*, 116 S.Ct. at 1768–69 (distinguishing between cases in which an individual taxpayer suit brought to redress "misuse of public funds, or . . . other public action that has only an indirect impact on his interests" which can be precluded, and cases in which taxpayers sue to constitutionally challenge a "State's attempt to levy *personal* funds," for which res judicata is generally not available); *Satsky v. Paramount Communications, Inc.*, 7 F.3d 1464, 1469 (10th Cir.1993) (holding that consent judgment in a prior state action barred claims for natural resources held by the state, but not claims for private injuries as there was no privity between the state and plaintiffs where the state lacked *parens patriea* standing to pursue private citizen's individual claims); *Eyak Native Village v. Exxon Corp.*, 25 F.3d 773, 777 (9th Cir.) *cert. denied*, 513 U.S. 943, 115 S.Ct. 351, 130 L.Ed.2d 307 (1994) (same); *Alaska Sport Fishing Association v. Exxon Corp.*, 34 F.3d 769, 772 (9th Cir.1994) (same); *see also United States v. Yonkers Bd. of Educ.*, 902 F.2d 213, 217 (2d Cir.1990) (denying intervention to seven individual members of the Yonkers Park Commission in action relating to the public park because interests of intervenors were adequately represented by the City as a party to the proceedings).

In sum, the rule to emerge from these cases is that where a citizen asserts private interests or alleges "violations of substantial individual rights that have caused particular damage to the individual, recovery for such damages is generally permitted notwithstanding a prior pending action by the government." 18 Moore's § 131.[3][e][B], p. 131–150. Conversely, "[w]hen a state is a party to litigation involving matters of general public interest such as the . . . protection of natural resources the state acts as a representative of its citizens, who are bound by the resulting judgment." *Id.* at p. 131–149.

Thus, the answer to the question presented by defendants' declaratory judgment motion—namely, whether the Town "adequately represented" plaintiffs in the *BAM Action*—hinges on the character of the interests asserted by plaintiffs here, and on the character of the interests asserted by the Town in the prior litigation. Put another way, we must determine whether the relationship between the Town and plaintiffs "is sufficiently close to [support] preclusion." *Amalgamated Sugar v. NL Industries*, 825 F.2d 634, 641 (2d Cir.1987) (quoting *Southwest Airlines v. Texas Int'l Airlines*, 546 F.2d 84, 95 & n. 38 (5th Cir.1977)). This is, as are all privity inquiries within the res judicata context, "a legal determination for the trial court." *Phillips*, 750 F.Supp. at 607 (citing *Amalgamated Sugar*, 825 F.2d at 640–41 (quoting *Southwest Airlines*, 546 F.2d 84, 95, and n. 38 (5th Cir.1977) ("privity . . . represents a legal conclusion))).

This Court determines that as a matter of law the Town "adequately represented" its residents, including plaintiffs in this case, in the prior *BAM Action.* The interests asserted in that litigation were of an exclusively public character. It is undisputed that the Town's objections to the Tower were premised on concerns over its aesthetic affect on the residents of the municipality generally. *See* Town's Answer in *BAM Action*, Doc. 4 at § 49 in 97 Civ. 8650 (defending on the grounds that the proposed towers would have adverse "visual impacts . . . on a ridgeline in a rural and rustic portion of the municipali-

ty."). In the *parens patriea* context, it is well established that a state may sue to protect its citizens' interests in "the air over its territory," *Satsky*, 7 F.3d at 1469 (quoting 12 Moore's Federal Practice § 350.02[3] at p. 3–20 (1993)), or to put it another way, that the state's interest is "behind the titles of its citizens, in all the earth and air within its domain." *Badgley*, 606 F.2d at 365 (quoting *Georgia v. Tennessee Copper Co.*, 206 U.S. 230, 237, 27 S.Ct. 618, 51 L.Ed. 1038 (1907)). By analogy, the Court concludes that the interest in "views" arising under SEQRA is exclusively an interest of a general public character.[11]

The Court also concludes that plaintiffs here, and the Town's residents generally, have no private interests or individual rights that extend beyond the general public interest asserted by the Town in the prior *BAM Action*. Although plaintiffs, and certain other Town residents, may feel especially aggrieved by the specific location of the Tower, SEQRA merely required that the Town minimize to the greatest extent possible the aesthetic effects of the Tower on the municipality as a whole. *See* ECL 8–0109[1]. Nor does New York common law confer upon plaintiffs, or any other Town resident, private individualized interests in unobstructed views. *See supra* at p. 324.

▪ In sum, the principle that "[p]rivate litigation may be precluded by public action, since 'governments are by their nature representative of the cumulative rights of private citizens.'" 18 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 4458, at 521 (quotation omitted), is particularly applicable to the circumstances of this case. Because the Town's residents, including plaintiffs here, have no private individualized interests in the visual impact of the Tower, beyond those general public interests asserted by the Town in the prior *BAM Action*, the Town's elected officials were the virtual representatives of all its residents in the prior suit. To put it another way, the common public rights of plaintiffs here, and of the Town's residents

generally, were represented by the Town in the *Bam Action*, and like it, the Town's residents are bound by the Consent Judgment. *City of Tacoma*, 357 U.S. at 340–41, 78 S.Ct. 1209; *Washington v. Fishing Vessel Ass'n*, 443 U.S. at 692–93 n. 32, 99 S.Ct. 3055. Accordingly, all actions, including the present suit, that contest the issuance of the Permits are precluded by the Consent Judgment.

### 3. Permanent Injunction

As our Court of Appeals recognized in *Baldwin*, 770 F.2d at 338, the All Writs Act confers upon this Court the authority to bind non-parties to protect the settlement process. In this case, as in *Baldwin*, the Court is presented with the distinct possibility of "multiple and harassing actions" which would only serve to frustrate the result of our efforts to craft a settlement. *Id.* The Court believes that in such circumstances, individual residents must be precluded from asserting the same claims on behalf of themselves, as their elected representatives had asserted on their behalf in an earlier action. Otherwise, as a practical matter, no litigant in a Federal Telecommunications Act case could reasonably be expected to settle a case in an expeditious fashion, without first obtaining the express consent of every individual resident of the municipality involved, for fear that such individuals could reassert all claims in another proceeding.

Accordingly, a permanent injunction shall issue in this case enjoining plaintiffs, their successors and assigns and all persons with actual knowledge of the injunction from challenging in any forum, except on direct appeal in this case, the validity of the Permits issued pursuant to the Consent Judgment in the *BAM Action*, 97 Civ. 8650.

Settle a final judgment on 10 days notice, or on waiver of notice.

SO ORDERED.

---

11. Our conclusion in this regard is supported by the fact that the statute itself calls for the appointment of a "lead" agency to represent the cumulative interests of a locality's citizens. *See* ECL 8–0111.