OPINION OF THE COURT
Walter J. Relihan, Jr., J.
The East Coast Development Company brings a CPLR article *431 78 proceeding to nullify a decision of the City of Ithaca Planning Board which rejected petitioner’s site plan for a commercial building, to be located in a commercial zone bordered by an undeveloped floodway zone. The structure, of 130,000 square feet with expansion space for 30,000 more, would be occupied by a Wal-Mart discount store.* The construction, including parking for 800 or 900 cars, would occupy about 15 acres of the 24.5-acre site.
Petitioner contends that the decision unlawfully denies the petitioner’s right to the use of its property on the pretext of environmental concerns. The real purpose of the decision, petitioner argues, is to discourage new enterprise, prevent competition and protect the investment of small retailers located in the City’s central business district. The City maintains that the decision is justified by substantial evidence in the record that the Wal-Mart discount store would adversely affect community interests which fall within the cognizance of the State Environmental Quality Review Act (SEQRA) and an implementing local law (City Environmental Quality Review Act).
The petitioner argues that SEQRA, though recognizing the relevance of social and economic factors (ECL 8-0103 [7]), does not permit State and local authorities to reject new projects solely because of their possible effect upon existing business. The City responds that the "Environment”, as defined by SE-QRA (ECL 8-0105 [6]), includes not only physical conditions but also "existing community or neighborhood character”, and, consequently, that its examination of the competitive economic implications of the project was justified.
The Court of Appeals held, in Chinese Staff & Workers Assn. v City of New York (68 NY2d 359, 366), that: "the impact that a project may have on population patterns or existing community character, with or without a separate impact on the physical environment, is a relevant concern in an environmental analysis since the statute includes these concerns as elements of the environment.” There, a high-rise building had been proposed which would displace local residents and businesses and directly alter the unique character of Chinatown.
The case at bar, however, is not comparable. The proposed Wal-Mart project, though within the City, is far removed from *432 the central business district. The advent of the project would displace no one (the site is undeveloped) and would not alter the physical character of any coherent cultural enclave or neighborhood. The ultimate effect of the project upon the central business district, if any, would reflect larger and more diffuse economic forces which, over time, might affect the retail economy of the City and surrounding areas.
The Board began its labors, we are advised, under the impression that competitive economic factors could be weighed in the balance, along with consequences affecting land, air, water and other elements of the natural world (cf., Chinese Staff & Workers Assn. v City of New York, supra). However, Society of Plastics Indus. v County of Suffolk (77 NY2d 761, 773, 774) made it plain that the zone of interests protected by SEQRA is not without limit and that "groups whose [competitive economic] interests are only marginally related to * * * the purposes of the statute cannot use the courts to further their own purposes” (at 774). This cautionary holding was extended in Sun Co. v City of Syracuse Indus. Dev. Agency (209 AD2d 34, 50) to government agencies responsible for the conduct of SEQRA proceedings.
A judicial consensus has emerged that SEQRA does not authorize governmental agencies, under the guise of environmental protection, to manipulate the flow of private investment in order to advance their own economic master plan (see, Society of Plastics Indus. v County of Suffolk, supra; Matter of Mobil Oil Corp. v Syracuse Indus. Dev. Agency, 76 NY2d 428, 433; Sun Co. v City of Syracuse Indus. Dev. Agency, supra; Matter of Nixbot Realty Assocs. v New York State Urban Dev. Corp., 193 AD2d 381; Matter of Wilder v New York State Urban Dev. Corp., 154 AD2d 261, 262, lv denied 75 NY2d 709). We conclude that the Board decision cannot be sustained if based solely upon the anticipation that a Wal-Mart store would adversely affect the existing downtown retail marketplace.
The City concedes that it retained a consultant, at petitioner’s expense, to perform a competitive economic impact study. Unsatisfied by the consultant’s initial report, that the project might generate favorable effects, the Board demanded more pointed predictions about the effect upon several specific retailers in the central business district. Other questions sought estimates of wage levels and employment numbers, assuming a Wal-Mart location within or without the City and, finally, an evaluation of the Wal-Mart effect in comparable municipalities in New York and New England. These inquiries would be *433 important to an agency responsible for central economic planning or the management of private investment. Their relevance to issues properly before the Board, as a SEQRA lead agency, is less clear.
The Findings Statement, prepared by the City’s planning staff, reported that: "The dislocations that could occur as a result of this development would place at risk the viability of nearly twenty five years of continuous effort to support and revitalize the City’s CBD [i.e., central business district]”. The Board approved the Findings on October 24, 1995. Two days later, in conspicuous contrast, the Board eschewed all reference to economic effects, resting its rejection of the site plan solely upon environmental grounds. However, the minutes of the October 26th meeting include the remarks of a dissenting member who recalled the competitive economic issues which had agitated the Board in earlier proceedings. The conclusion is inescapable that both economic and environmental factors played a role in the final decision of the Board.
Nevertheless, the City contends, the actual decision of the Board, as distinguished from the wide-ranging discussions which appear in the final environmental impact statement (FEIS), is grounded upon legitimate environmental factors. Accordingly, we turn to the Findings of October 24th and the Board’s site plan decision of October 26th. A prominent and controversial feature of the FEIS and the Findings involved the visual impact of the project upon observation points along a viewshed between nearby Buttermilk Falls State Park and the project site.
The Court of Appeals, at least since 1963, has sustained the exercise of the police power to prevent the degradation of the visual environment (People v Stover, 12 NY2d 462, 467; and see, Matter of Cromwell v Ferrier, 19 NY2d 263; People v Goodman, 31 NY2d 262, 265; Matter of McCormick v Lawrence, 54 AD2d 123, 125). Moreover, by its enactment of SEQRA, the Legislature implicitly declared that aesthetic preservation is a matter of public concern no less than physical threats to the environment (ECL 8-0103 [1]). The question, therefore, is not whether aesthetics may be considered as part of the SEQRA process but whether the visual impact of the proposed WalMart building has been realistically measured and documented and, if so, whether the conclusion of the Board, that the effect is substantial and detrimental, is supported by adequate evidence in the record (Matter of WEOK v Planning Bd., 79 NY2d 373, 383).
*434 At the outset of the environmental review process, the petitioner’s engineering firm was asked to stake out the four corners of the buildings proposed in the two alternate plans. Balloons were floated from each point at a height corresponding with the designed roof line. Photographs were taken of the site from the primary viewing point along the main Buttermilk Falls State Park trail. A viewshed line was then devised and applied to site maps. Finally, a consulting firm produced drawings to illustrate the relation of the proposed buildings, as located on the site, to the viewshed. The verisimilitude of these projections, as opposed to the aesthetic conclusions to be drawn from them, is not disputed.
Based on these measurements and studies, the Findings state, at section. 5.2, that: "The proposed total development of an approximately 155,000 square foot building and associated parking lot * * * will create a substantial visual impact on the only view station of the main hiking trail in the Park from which a largely unobstructed view over the Cayuga Inlet Valley is available. Alternative SE-1 locates nearly the entire development, including nearly all parking and circulation areas, within the viewshed * * * the visual impact of this parking lot is not reduced by any significant provision of internal planting areas”.
The gorge and falls in the park are visited by some 180,000 persons each year. A Finger Lakes State Parks landscape architect, consulted by the City, opined that: "Visual impacts to trail users will be significant in all seasons. Most views from the park’s heavily used gorge and rim trails that look beyond the park boundaries focus on the Wal-Mart site. While the character of this park is slowly changing due to the pressures of development, the sense of isolation from its increasingly urban surroundings still persists. As such, parks believe that successful mitigation of visual impacts of the proposed project must include minimizing the visual presence of the development in the Cayuga Inlet Valley as viewed from the park” (FEIS, Appendix I, § 3). Other factors (viz., "light spillage”, noise, storm water drainage were also assessed and played an important part in the FEIS.
The Court of Appeals has spoken on the subject, most recently, in Matter of WEOK v Planning Bd. (supra). There, the petitioner submitted a site plan for a commercial project to be located in a commercial zone. The application was denied based upon the alleged visual effect of the project upon a distant site of public importance and value. The Planning *435 Board conducted a visual impact study which, however, demonstrated that the project (radio towers) would not be visible at the Franklin D. Roosevelt (FDR) homestead in nearby Hyde Park. The Board, in the absence of substantiating facts, based its negative decision primarily upon statements from some community members, agencies and organizations, that the study was flawed and that the towers "may” be visible at the FDR homestead (79 NY2d, at 384). The Court concluded that the community objections to the visual impact study were not "supported by any factual data and at best were mere conjecture” (79 NY2d, at 384). Here, by contrast, the facts which establish the presence of the project in the viewshed are well documented in the record.
We conclude, therefore, that the aesthetic impact of the project was properly a factor to be considered under SEQRA, and that the Board took notice of pertinent facts and considered competent opinion evidence based upon such facts. It remains to consider the petitioner’s argument that the negative visual effects were overblown and misused to cloak the Board’s ulterior purpose to frustrate and, ultimately, to defeat new investment and new enterprise.
"The eye is entitled to as much recognition as the other senses, but, of course, the offense to the eye must be substantial” (Matter of Cromwell v Ferrier, supra, at 272). Clearly, the rights of property must not be held hostage to mere flights of aesthetic fancy or even the general unhappiness registered by vocal partisans of the bucolic status quo (Matter of WEOK v Planning Bd., supra, at 384, 385).
Visual effects, and their aesthetic qualities, are no more susceptible to objective measurement than many other concepts which are regularly encountered by courts of law (viz., "reasonable” conduct in the law of torts). Subjectivity, therefore, is no impediment to the work of courts or municipal administrative agencies. Here, the Board had the benefit of competent opinion evidence that the presence of SE-1 in the viewshed would be significant and required mitigation in order to preserve environmental values.
The petitioner attacked that evidence as pretextual but submitted no competing expert testimony to the Board. We recognize that a dissenting member of the Board opined that only a fraction of the visitors to the Buttermilk Park used the main hiking trail and, of these, most are focused upon the immediate beauty of the gorge and waterfalls, not a distant view of the valley to the west. However, even assuming that a quali *436 tied expert had given an opinion that the negative visual effect was insubstantial, the Board would have been authorized to exercise a "reasonable” choice between such opposing opinions (Matter of Chemical Mfrs. Assn. v Jorling, 85 NY2d 382, 396).
In the end, the Board must weigh the relevant environmental facts, discard those lacking in substance, balance those in conflict, and reach a rational conclusion. Assuming these duties have been honestly performed, we are not free to revisit the Board conclusions, simply to measure them by a rival set of sensibilities (Matter of Chemical Mfrs. Assn. v Jorling, supra, at 396). The court must determine whether the Board followed the statutory steps and reached rational conclusions supported by credible" evidence. Finally, the court must be able to conclude that no error of law was committed. In the words of the Court of Appeals: "it is not the role of the courts to weigh the desirability of any action or choose among alternatives, but to assure that the agency itself has satisfied SEQRA, procedurally and substantively” (Matter of Jackson v New York State Urban Dev. Corp., 67 NY2d 400, 416).
The record discloses that the SEQRA process was improperly protracted by the Board’s consideration of social and cultural objections to the project which fell beyond its proper purview. It is also undeniable that the FEIS and Findings Statement entwine both economic and environmental factors. Nevertheless, considering only the aesthetic and other environmental evidence, we conclude that the denial of the petitioner’s application was supported by substantial evidence and that the Board performed its statutory duties in a lawful manner. Lastly, there is nothing in the record to justify the apprehension that the Board’s actions, to date, portend that petitioner will be denied all beneficial use of its property in the future.
The petition is denied.

 An alternate plan proposed a somewhat smaller building. The Board concedes that the alternate was hastily submitted in the form of a sketch which did not meet the requirements of the City’s site plan approval ordinance. Accordingly, we regard its rejection as unofficial and without effect.