NEW YORK SMSA LIMITED PARTNERSHIP d/b/a/ Verizon Wireless f/k/a Bell Atlantic Mobile, Plaintiffs,

v.

TOWN OF RIVERHEAD TOWN BOARD, The Town of Riverhead Planning Department and The Town of Riverhead Architectural Review Board, Defendants.

No. CV00–1434.

United States District Court, E.D. New York.

Oct. 24, 2000.

Amato & Associates, P.C. by Alfred Amato, David N. Altman, Leon Friedman, Garden City, NY, for plaintiffs.

Smith, Finkelstein, Lundberg, Isler & Yakaboski, LLP, by Gair G. Betts, Frank A. Isler, Riverhead, NY, for defendants.

*MEMORANDUM AND ORDER*

WEXLER, District Judge.

This is a case brought pursuant to the Telecommunications Act of 1996 (the

"TCA"). Plaintiff, New York SMSA Limited Partnership d/b/a/ Verizon Wireless f/k/a Bell Atlantic Mobile ("Plaintiff" or "Verizon") seeks a mandatory injunction requiring defendants (collectively the "Town") to issue all permits necessary to allow Verizon to construct a wireless communication facility at a site proposed by Plaintiff located within the Town.

Presently before the court is Verizon's motion, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for summary judgment granting Plaintiff all the relief sought. The Town urges the court to search the record and grant summary judgment in its favor. For the reasons set forth below, Verizon's motion is denied and this matter is dismissed.

### BACKGROUND

### I. *Factual Background*

The facts set forth below appear in the complaint as well as in the comprehensive factual written record submitted by the parties.

### A. *The Facility*

Verizon seeks to construct a wireless communication facility (the "Facility") within the Town. The Facility is proposed to consist of a sixty-two foot tall monopole, nine small panel antennas and one ground positioning antenna attached to the monopole.[1] Additionally, the Facility includes a twelve by twenty foot equipment shelter.

The site at which Verizon seeks to construct the Facility (the "Site") is located within a 1200 square foot leased area in the Town. This property is situated on an 89.5 acre parcel owned by the Boy Scouts of America and used for a summer camp known as "Camp Baiting Hollow." According to Verizon, the Site is surrounded by trees that are between forty and fifty-five feet tall.

### B. *Verizon's Attempt to Secure the Permit Necessary to Build the Facility*

Verizon began the permit process by submitting a "Special Permit Application" to the Town on March 8, 1999. Along with its application, Verizon submitted an Environmental Assessment Form ("EAF"). The EAF was submitted in connection with the expected review of the Facility pursuant to the New York State Environmental Quality Review Act ("SEQRA"). Before turning to discuss the next step in Verizon's application process the court digresses to outline the relevant SEQRA procedure.

### i. *The SEQRA Procedure*

SEQRA is a New York State law reflecting the intent of the New York State Legislature that state agencies "conduct their affairs with an awareness that they are stewards of the air, water, land and living resources, and that they have an obligation to protect the environment for the use and enjoyment of this and all future generations." 6 N.Y.C.R.R. § 617.1(b); *see* N.Y. Env. Cons.L ("ECL") § 8–0101. To that end, SEQRA requires local authorities to consider whether their actions will have a significant adverse impact on the environment. *Sprint Spectrum, L.P. v. Willoth,* 176 F.3d 630, 636 (2d Cir.1999). If a proposed action is determined to have such an impact, SEQRA requires agency and public notification of the project. Such notification is accomplished, in the main, by the preparation and circulation of an Environmental Impact Statement ("EIS"). ECL 8–0109(2).

The first step in the SEQRA procedure is establishment of a "lead agency" to coordinate the process. *See* ECL 8–0111(6). The lead agency is required to make the initial determination as to whether the pro-

---

1. Verizon's application sought approval for construction of a sixty-two foot monopole. During the application process the Town Planning Department suggested that Verizon

construct a larger monopole. The difference in size is not relevant to the court's decision herein.

posed action is subject to SEQRA's requirement that an EIS be prepared. This involves determination of whether the action is a "Type I" action, a "Type II action" or an "unlisted action."

Type II actions are those that are determined to have no significant impact on the environment. If an action is deemed to be a Type II action, SEQRA requires no further environmental review. *See* 6 NYCRR 617.5(a). An example of a Type II action is the repaving of an existing highway not involving the addition of new travel lanes. 6 NYCRR 617.5(c)(4). SEQRA Type I actions are those that will likely have a significant adverse impact on the environment. Actions that are neither Type I nor Type II actions are referred to as unlisted actions.

If a proposed action is deemed to be a Type I or an unlisted action it may require the preparation of a full EIS. The first step in determining whether a full EIS must be prepared is the lead agency's review of an Environmental Assessment Form ("EAF") or, in the alternative, a Draft EIS, ("DEIS"). The lead agency reviews the EAF (or the DEIS) and determines whether the project requires preparation of a full EIS. This decision rests upon the lead agency's conclusion as to whether the proposed action has the potential for at least one significant adverse environmental impact. *See* 6 NYCRR 617.7(a)(1). If the finding of at least one adverse environmental impact is made, the lead agency will require the preparation of a full EIS. Such a finding is commonly referred to as a SEQRA "positive declaration."

■ Under SEQRA, the visual impact of a project may be a significant adverse environmental impact that can result in a positive SEQRA declaration triggering preparation of a full EIS. *See WEOK Broadcasting Corp. v. Planning Board of the Town of Lloyd,* 79 N.Y.2d 373, 381, 583 N.Y.S.2d 170, 173, 592 N.E.2d 778 (1992); 6 NYCRR § 617.2(b)(1); *East Coast Development Co. v. Kay,* 174 Misc.2d 430,

433, 667 N.Y.S.2d 182, 185 (N.Y.Sup.1996) ("by its enactment of SEQRA, the Legislature implicitly declared that aesthetic preservation is a matter of public concern no less than physical threats to the environment"); *see also Cellular Telephone Co. v. Town of Oyster Bay,* 166 F.3d 490, 495 (2d Cir.1999) (aesthetic concerns can be valid basis for zoning decisions, even under the TCA, if supported by more than a scintilla of evidence).

The process of preparing a final EIS requires circulation of a DEIS to all agencies having an interest in the project as well as members of the public. Any public hearing on the DEIS is to be held within sixty days of the filing of the DEIS. ECL 8–0109 § (5). After public comment on the DEIS a final EIS ("FEIS") is prepared and circulated in the same manner as the DEIS. The FEIS must be prepared within forty-five days after the close of the public hearing on the DEIS. ECL 8–0109 § (5). If the proposed project is approved by the lead agency, that agency must make explicit findings that SEQRA's requirements have been met and that the adverse environmental impact referred to in the FEIS will be minimized to the maximum extent possible. Because of SEQRA's requirement for periods of public circulation and comment regarding the DEIS, FEIS and any necessary supplemental EIS, a positive declaration under SEQRA will necessarily result in a delay in the approval of any project.

ii. *The Town Procedures and Hearings Regarding Approval of the Facility*

1. *The Town Planning Board*

As noted above, Verizon began the permit process by submission of its application and EAF on March 9, 1999. On March 29, 1999, Joseph B. Hall, an employee at the Town's Planning Department, upon review of Verizon's EAF, prepared an interoffice memorandum indicating that the Facility did not implicate SEQRA and recommending that the

Town issue a "negative declaration" with respect to the Facility. Thereafter, on May 4, 1999, the Town Board adopted a resolution declaring itself to be the lead agency with respect to the Facility application and determined the application to be an "unlisted action" under SEQRA. The Town directed that Verizon's application be forwarded to the Town Planning Board for report and recommendation as to the SEQRA implications of the Facility.

On July 1, 1999, Verizon appeared before the Town Planning Board to request a negative declaration under SEQRA and that its application to build the Facility be approved. In a resolution dated August 6, 1999, the Town Planning Board issued a resolution recommending that the Town Board approve Verizon's permit application. The resolution was conditioned, *inter alia,* upon the Town Board's consideration of approval of a higher tower so as to accommodate future users and Verizon's submission of a written agreement to the Town Board indicating their agreement that the proposed monopole will accommodate future users.

### 2. *Hearings Before the Town Board*

A public hearing before the Town Board regarding the Facility was held on September 21, 1999. At that hearing Verizon submitted numerous documents for the Town Board's consideration, including engineering reports, reports demonstrating a deficiency in cellular coverage (a "gap") and the elimination of that gap by the Facility, a health report indicating that frequencies emitted by the proposed tower were well below those deemed acceptable by the FCC and a visual impact analysis.

Town residents were given the opportunity to comment during the September 21, 1999 hearing. At that meeting, they expressed their opposition to the Facility, based primarily upon aesthetic (audio and visual) concerns. Many residents expressed concerns that the visual impact analysis submitted by Verizon was con-

ducted during the summer months. Residents were interested in a winter analysis that would reveal the visual impact of the monopole when trees were bare. Town residents requested that Verizon submit plans for alternative sites and expressed the need for more time to familiarize themselves with and rebut the well-prepared testimony offered by Verizon.

After hearing the testimony of Town residents, Verizon's counsel requested that the hearing be held open for a forty-five day period in which to order the transcript and respond to residents'· concerns. In response to this request and the concerns expressed by residents, the Town Board agreed to leave the hearing open until November 16, 1999.

Prior to the November 16, 1999 meeting, Verizon forwarded a written submission to the Town Board attempting to address the issues raised by Town residents at the September 21, 1999 hearing. At the November 16, 1999 meeting, Town residents again expressed strong opposition to the Facility. That opposition noted the great expense in attempting to garner expert testimony to oppose the evidence presented by Verizon and continued to center largely around aesthetic concerns.

For example, Town residents described the Site as pristine and challenged Verizon's position that the monopole would not be visible from surrounding areas. Concerns were also raised regarding the Facility's possible impact on a nearby bird sanctuary and migrating birds. Additionally, residents expressed their concern that the monopole would have a negative impact on property values.

While residents conceded that the Town Board could not properly base their decision on health concerns, standing alone, they nonetheless voiced their opposition to the Facility based upon health concerns and their doubts concerning the permissibility of radio frequency levels approved by the FCC. A health concern not concerning radio frequencies was raised by a resi-

dent who expressed apprehension over the location of the Facility on the grounds of a Boys Scout camp, where it might be accessed by young children. Finally, a representative of the Boy Scouts of America, owner and lessor of the Site to Verizon, spoke in favor of approval of the permit to erect the Facility.

At the close of the November 16, 1999 public meeting, the Board agreed to hold the meeting open for written comment until December 7, 1999. Upon Verizon's written request for additional time, the period of public written comment was extended to December 21, 1999. Written comments addressing resident's concerns regarding the Facility were submitted by Verizon during this last period of public comment. Verizon's comments included studies indicating that property values would not be impacted by the Facility, that the monopole would not be visible from surrounding areas, even during the winter months, and that there was no feasible alternative site that would bridge the gap in cellular coverage. December 21, 1999 was the date upon which the Town Board's hearing regarding Verizon's permit application was closed.

### 3. *Town Proceedings After the Close of the Hearing*

In a letter dated February 7, 2000, counsel for Verizon reminded the Riverhead Town Attorney of the requirement, under the New York State Town Law, that a decision on Verizon's application be rendered within sixty-two days of the close of the hearing. That sixty-two day period was to expire on February 21, 2000. The letter advised the Town Attorney that if the Town failed to act by February 21, 2000, Verizon would have no choice but to commence an action against the Town, pursuant to the TCA, for its failure to act.

The last action of the Town, prior to commencement of this lawsuit, was taken on February 15, 2000. On that date the Town Board issued a positive SEQRA declaration regarding construction of the Fa-

cility. The positive declaration stated that the Town "has reason to believe the potential for significant impact exists relative to conflict with adopted plans or goals, area character, aesthetics and human health." The declaration further stated that these potentials "when compared to the criteria of 617.7(c) [of SEQRA] warrant the preparation of an [Environmental Impact Statement] and scoping will be conducted to properly focus the analysis."

As a consequence of the Town's positive SEQRA declaration, Verizon is required to prepare a full EIS. As noted, the preparation of the EIS will necessarily delay approval of Verizon's application to construct the Facility. According to Verizon, preparation of the EIS and associated hearings and procedures will delay decision on its application for at least another full year. The Town disputes this assessment and, in an affidavit of a Town councilperson submitted in opposition to the present motion, asserts that the EIS will be narrow in scope and will not cause "undue delay."

### C. *The Complaint and Verizon's Motion*

Instead of moving forward with preparation of its EIS and the SEQRA process, Verizon commenced this action. The action was commenced in March of 2000— one month after issuance of the positive SEQRA declaration. In its complaint, Verizon alleges that the Town's positive SEQRA declaration is nothing more than a "transparent attempt to further delay consideration" of the application to build the Facility. Verizon characterizes the positive SEQRA declaration as "tantamount" to a denial of its application.

Verizon's complaint contains three causes of action. The first cause of action argues that the positive SEQRA declaration violates Verizon's right, under the TCA, to action on its application within a reasonable period of time. *See* 47 U.S.C. § 332(c)(7)(B)(ii). The second cause of action states that the Town's positive

SEQRA declaration is tantamount to a denial of the requested permit and that this "virtual denial" allows Verizon to commence this action and have the court render a decision as to whether the Town's "denial" is supported by substantial evidence in the record, as required by the TCA. *See* 47 U.S.C. § 332(c)(7)(B)(iii). Finally, Verizon's third cause of action alleges that the Town has violated the provision of the TCA which prohibits the regulation or placement of wireless facilities on the basis of environmental effects or radio frequency emissions, to the extent that proposed facilities comply with the regulations of the Federal Communications Commission. *See* 47 U.S.C. § 332(c)(7)(B)(iv). The relief sought is an injunction requiring issuance of whatever permit is necessary to allow construction of the Facility.

Five months after commencement of this action, Verizon submitted the present motion for summary judgment. Along with the motion, Verizon submitted the entire record of proceedings before the Town.

### DISCUSSION

#### I. Standard For Motion For Summary Judgment

A motion for summary judgment is properly granted only if the court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FRCP 56(c); *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The party seeking judgment bears the burden of demonstrating that no issue of fact exists. *McLee v. Chrysler Corp.* 109 F.3d 130, 134 (2d Cir.1997). However, when the nonmoving party fails to make a showing on an essential element of its case with respect to which it bears the burden of proof, summary judgment will be granted. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The party resisting summary judgment must not only show a disputed issue of fact, but it must also be a material fact in light of substantive law. Only disputed facts that "might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 242, 106 S.Ct. 2505.

#### II. The Telecommunications Act of 1996

The TCA was enacted to "provide a pro-competitive, deregulatory national policy framework designed to accelerate rapidly private sector development of advanced telecommunications and information technologies and services ... by opening all telecommunications markets to competition.... *Cellular Telephone Company v. Town of Oyster Bay,* 166 F.3d 490, 492–93 (2d Cir.1999)", quoting, H.R.Conf. Rep. No. 104–458, at 206 (1996), reprinted in 1996 U.S.C.C.A.N. 124, 124.

In recognition of the facts that the expanding telecommunications industry requires construction of wireless facilities, including communications towers, and that local governments are called upon to determine whether such structures may be built, Congress enacted Section 332 of the TCA to regulate, in part, this procedure.[2] Section 332 provides for judicial review of any local decision denying a request to "place, construct or modify," wireless service facilities. Specifically, any person adversely affected by a State or local decision inconsistent with the requirements of Section 332 may commence an action to review that decision. The statute provides for prompt judicial action allowing the party adversely affected to commence an action within thirty days of the adverse determination in any court of competent jurisdiction. 47 U.S.C. § 332(c)(7)(B)(v). Such actions are to be heard and decided on an "expedited basis." 47 U.S.C. § 332(c)(7)(B)(v).

**2.** When the court makes reference herein to "Section 332" the court is referring to 47 U.S.C. § 332(c)(7) which is the codification of section 704 of the TCA.

Section 332 seeks to strike a balance between encouraging the growth of telecommunications systems and the right of local governments to make land use decisions. This balance is sought to be achieved by giving weight to the recognized importance of seamless wireless coverage as well as the right of local governments to make land use decisions.

Encouragement of the growth of the telecommunications industry is fostered by the TCA requirement that local authorities act on any request for authorization to construct personal wireless service facilities within a "reasonable period of time." 47 U.S.C. § 332(c)(7)(B)(ii). Further, local governments regulating the "placement, construction, and modification" of wireless services facilities are expressly prohibited from: (1) unreasonably discriminating among providers of functionally equivalent services and (2) prohibiting or having the effect of prohibiting the provision of personal wireless services. 47 U.S.C. § 332(c)(7)(B)(i)(I) and (II).

Finally, the TCA allows for prompt judicial review of zoning decisions regarding the construction of wireless facilities. The standard of judicial review to be applied to such zoning decisions is further evidence of the Congressional interest in fostering the growth of the telecommunications industry. To pass muster under the TCA, the denial of a request to construct a wireless facility is required to be "in writing and supported by substantial evidence in the record." 47 U.S.C. § 332(c)(7)(B)(iii); *Willoth*, 176 F.3d at 636. This standard of review is significantly broader than a federal court's traditional review of local zoning decisions. *Cellular Telephone Company v. Town of Oyster Bay*, 166 F.3d 490, 493 (2d Cir.1999).

While requiring close review of local zoning decisions regarding the placement of wireless facilities, the TCA and the courts interpreting that statute acknowledge the legitimate local interest in such determinations. As recognized by the Second Circuit in *Sprint Spectrum, L.P. v.*

*Willoth*, 176 F.3d 630 (2d Cir.1999), the goals of increasing competition and "rapid deployment of new technology" do not "trump all other considerations, including the preservation of the autonomy of states and municipalities." *Willoth*, 176 F.3d at 639.

Significantly, Section 332 is entitled "Preservation of local zoning authority," and provides that nothing in the TCA shall "limit or affect the authority of a State or local government . . . over decisions regarding the placement, construction, and modification of personal wireless service facilities." 47 U.S.C. § 332(c)(7)(A).

The legislative history of the TCA illustrates the importance of preserving local land use authority. As set forth in the Senate Report, Section 332 "preserves the authority of State and local governments over zoning and land use matters except in the limited circumstances" set forth in Section 332. Sen. Rep. No. 104–230 at 458 (1996). The Senate Report further states that localities were to have the "flexibility to treat facilities that create different visual, aesthetic or safety concerns differently to the extent permitted under generally applicable zoning requirements even if those facilities provide functionally equivalent services." *Id.* at 459.

With these principles in mind, the court turns to consider the merits of Verizon's claims.

### III. *Judicial Review Granted by the TCA*

As noted above, the TCA grants the right of judicial review to a party "adversely affected by any final action or failure to act" of a local government. *See* 47 U.S.C. § 332(c)(7)(B)(v). As a threshold matter, then, the court must determine whether the actions of the Town constitute either a final act or a failure to act, sufficient to commence an action under the TCA. The issue of "failure to act" is relevant to the Court's inquiry regarding Verizon's first cause of action. The issue of whether there has been a "final act" is

relevant to the inquiry regarding the second and third causes of action.

### A. The First Cause of Action

 Verizon's first cause of action alleges a violation of 47 U.S.C. § 332(c)(7)(B)(ii). That section of the TCA requires local governments to "act on any request for authorization to place, construct or modify personal wireless service facilities within a reasonable period of time after the request is duly filed ... taking into account the nature and scope of such a request." 47 U.S.C. § 332(c)(7)(B)(ii). Any action predicated on this section must show a "failure to act" within a reasonable time.

The statute purposefully uses the term "reasonable" period of time, rather than setting forth an arbitrary time period in which an application must be either approved or denied. The term "reasonable" was no doubt used to allow local authorities the flexibility to consider each application on its individual merit. As recognized by the express language of the TCA, what is reasonable will necessarily depend upon the nature and scope of each request. In determining the reasonableness of the Town's acts, the court considers the event both prior to the SEQRA determination and the SEQRA declaration, standing alone.

Upon review of the extensive record presented, the court holds that, prior to the issuance of the positive SEQRA declaration, there was no unreasonable delay in acting on Verizon's application. To the contrary, the record reveals a steady pace of action by the Town, its residents and Verizon. Notably, on two occasions the public hearing was kept open for longer periods of time than originally proposed by the Town Board based on the request of counsel for Verizon. The Town's action regarding Verizon's application was characterized by hearings, expressions of legitimate concern and Verizon's attempt to assuage those concerns. That this exchange took a number of months is not prohibited by the TCA, it is required by the process of open and responsive government.

 Nor can the court accept the notion advanced by Verizon that the positive SEQRA declaration, standing alone, constitutes a failure to act within a reasonable time. As noted above, a positive SEQRA declaration necessarily delays a final decision. As discussed in greater detail below, however, SEQRA is an important New York State statute reflecting the clear legislative goals of the State. This court will not hold that a local government's invocation of that statute is precluded because of the existence of the TCA.

In view of the foregoing finding that there has been no unreasonable delay to act in violation of the TCA, the court dismisses Verizon's first cause of action. *Accord Omnipoint Communications, Inc. v. Port Auth. of New York and New Jersey,* 1999 WL 494120 *13 (S.D.N.Y. July 13, 1999) (TCA does not require "approval" within a reasonable time, only "action").

### B. The Second Cause of Action

 Verizon's second cause of action seeks redress under 47 U.S.C. § 332(c)(7)(B)(iii). That section provides that a local decision denying a request for placement of a wireless communications facility be supported by substantial evidence on the record. Verizon concedes, as it must, that a denial of its application must precede the "substantial evidence" review set forth in the TCA. Verizon attempts to get beyond this jurisdictional hurdle by arguing that the positive SEQRA declaration is "tantamount" to a denial. The court disagrees.

As with any construction project, a positive SEQRA declaration with respect to the Facility will necessarily delay the approval process. Such a delay, however, is inherent in the SEQRA process and is not the same as ultimate denial. It is merely a request that more information be provided. Were the court to accept Verizon's

argument, it would completely divest local agencies of their right, and indeed their obligation, to review projects under the SEQRA process. This is a result that is mandated by neither the TCA nor state law under SEQRA.

First, as noted, the TCA specifically preserves local authority over land use decisions. If the exercise of that authority, through a SEQRA review or otherwise, delays a construction project, that is a consequence of local authority that the wireless industry must necessarily bear.

■ Moreover, allowing a TCA lawsuit to go forward at this time will completely short-circuit the SEQRA process in violation of well-established state procedure. As Verizon was no doubt aware when commencing this federal action, a local decision to issue a positive SEQRA declaration is not a final agency action that is reviewable under New York law. *Sour Mountain Realty, Inc. v. New York State Dep't of Environmental Conservation*, 260 A.D.2d 920, 921, 688 N.Y.S.2d 842, 845 (3d Dep't), *lv. denied*, 93 N.Y.2d 815, 697 N.Y.S.2d 562, 719 N.E.2d 923 (1999); *Town of Coeymans v. City of Albany*, 237 A.D.2d 856, 857, 655 N.Y.S.2d 172, 173 (3d Dep't), *lv. denied*, 90 N.Y.2d 803, 661 N.Y.S.2d 179, 683 N.E.2d 1053 (1997); *see Essex County v. Zagata*, 91 N.Y.2d 447, 453–54, 672 N.Y.S.2d 281, 284–85, 695 N.E.2d 232 (1998).

New York courts characterize a positive SEQRA declaration as an interim determination, which is not ripe for judicial review until the agency has made a final decision. *Sour Mountain Realty*, 260 A.D.2d at 921, 688 N.Y.S.2d at 845. The refusal of New York courts to subject a positive SEQRA declaration to judicial review recognizes the fact that further agency procedures, when completed, may very well moot the need for judicial intervention. *Essex County*, 91 N.Y.2d at 454, 672 N.Y.S.2d at 285, 695 N.E.2d 232. The concept is easily demonstrable here. If the Town approves Verizon's application after submission of the EIS there will be no need to for a

determination of the propriety of the positive declaration. On the other hand, allowing Verizon to go forward here would allow Verizon to accomplish in Federal court that which it cannot accomplish in State court—judicial review of a positive SEQRA declaration—a review which this court is unwilling to undertake.

Nor will compliance with the SEQRA process deny Verizon its rights under the TCA. The positive declaration merely requires compliance with State law prior to federal (or state) judicial review of the Town's determination. If, after review of the SEQRA submission, the Town denies Verizon's application, the company may promptly commence an action for review of that determination. Such action will be decided on an expedited basis as set forth in the TCA. *See* 47 U.S.C. § 332(c)(7)(B)(v).

Verizon relies heavily on *Lucas v. Planning Bd. of Town of LaGrange*, 7 F.Supp.2d 310 (S.D.N.Y.1998), in support of the notion that a positive SEQRA declaration qualifies as a "denial" under the TCA and, indeed, in support of the broader notion that the TCA preempts review under SEQRA. In *LaGrange*, the local authority not only issued a positive SEQRA declaration, but also passed a moratorium suspending all permits for telecommunications facilities without regard to the merit of the application. After extensive conferences with the court, the parties in *LaGrange* settled their differences and the Town rescinded the positive SEQRA declaration.

The *LaGrange* court's comments regarding SEQRA were made in the context of a lawsuit brought by residents seeking to invalidate the settlement on the ground of non-compliance with SEQRA, a factual difference that distinguishes that case form the present matter. Additionally, to the extent that the *LaGrange* court characterized the entire SEQRA procedure as a "state procedure, moratoria or gimmick" intended to tie up wireless providers in the

hearing process, this court must disagree with *LaGrange.* As noted above, it is not for this court to eviscerate SEQRA simply because it will result in delay of a final decision on Verizon's application. There is simply nothing in the TCA supporting such a broad preemption doctrine.

### C. *The Third Cause of Action*

■ Verizon's third cause of action alleges violation of the TCA prohibition against basing decisions regarding the placement of wireless facilities on the environmental effects of radio frequencies that comply with FCC standards. This cause of action fails for the same reason as the second cause of action; it is premature.

While the court certainly agrees that any final decision of the Town may not properly be based upon environmental effects of radio frequencies (to the extent those frequencies comply with FCC regulations), *Cellular Telephone Co. v. Town of Oyster Bay,* 166 F.3d 490, 495 (2d Cir. 1999); *see* 47 U.S.C. § 332(c)(7)(B)(iv), the court will not review the interim decision of the Town at this time. The Town has not yet made a final decision regarding placement of the Facility; the process is ongoing. It is thus premature for the court to consider whether a decision impermissibly rests on the environmental effects of radio frequencies.

### CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment is denied. In view of the facts that Plaintiff has failed to show unreasonable delay or a denial of its application sufficient to state a claim under the TCA the complaint is hereby dismissed. The Clerk of the Court is directed to close the file in this case.

SO ORDERED