OPINION OF THE COURT
Frank A. Sedita, III, J.
The ultimate question before the court is whether the most recently sanctioned expansion of the Chautauqua County Landfill (CCLF), as it stands and without further municipal approval, is legally permissible.
Factual Summary and Procedural History
The CCLF is a waste management facility located in the Town of Ellery, New York. The Town, with a population of approximately 4,500, is located in Chautauqua County, which has a population of approximately 135,000.
The County opened the CCLF in 1981, in accordance with County Law § 226-b. Prior to its opening, there were over 40 *484 “dumps” spread throughout the County, including at least one in the Town. It is unclear whether this patchwork of dumps was ever regulated. The CCLF, by contrast, has been regulated by federal and state agencies since its inception. The most notable of these regulatory agencies—the New York State Department of Environmental Conservation (DEC)—has since authorized several expansions of the facility.
The current CCLF sits on a portion of an 800-acre-plus plot of land owned by the County. It lays within an agricultural zone (the least restrictive zoning category) and is in a sparsely populated, rural area. The landfill and its adjacent structures sit on approximately 83 acres (or a little over 10% of the site) and are surrounded by over 700 uninhabited acres that are, in turn, bordered by farmland.
The CCLF provides state-of-the-art waste management technology, including a power plant that converts methane gas (a natural by-product of waste decaying inside an enclosed landfill) into electricity. It is a not-for-profit entity and is fiscally sound. A major source of its revenue are “tipping fees” from waste haulers and others, which alleviates the financial burden that would otherwise be faced by county taxpayers in paying for waste disposal.
The CCLF is the primary destination for the waste of all municipalities in Chautauqua County. The CCLF also accepts waste, on a limited basis, from two other counties in Western New York and three other counties in Northern Pennsylvania. Such a practice further subsidizes operational costs and reduces the regional market price for these essential services. One or two private companies would otherwise fill the void, and more handsomely charge the public for the privilege, should the CCLF curtail its operations.
Mindful of the length, purpose and scope of its operation, the CCLF has had a remarkably negligible impact on the environment. Initial complaints about dust, debris and odor were addressed years ago. Unavoidable truck traffic on the roads leading to and from the CCLF continues to be the chief complaint of a small number of citizens who live nearby. The CCLF has addressed this concern by minimizing the extent of its operations, i.e., it takes in only that amount of non-county waste needed to break even. There have been no environmental incidents—such as leakage of hazardous toxins into the groundwater or the release of dangerous pollutants into the air—by the facility. In short, the CCLF provides a safe, *485 environmentally sound and cost-effective means of managing waste.
The CCLF will exhaust its capacity to bury and process solid waste next year. Future options for waste disposal include contracting with nearby privately owned landfills to accept it, relocation and reconstruction of a new county facility at a different location, construction of an incineration facility at the present location, and expansion at the present location.
Contracting with privately owned nearby landfills would result in new, significant and recurring costs to the County. Such costs would necessitate increases in taxes or fees and/or cuts in government services, so as to balance the County’s already strained annual budget. It could also triple the regional market rate for these necessary services.
Relocation and reconstruction of a new facility within the county would necessitate site studies, an environmental review process and a construction process that would take up to 20 years to complete. The non-transportable infrastructure at the current site—which costs approximately $25,000,000 to purchase and install—would need to be replicated at any new site and would cost another $50,000,000.
Construction of an incineration facility at the current site would cost at least $80,000,000. It would also require the CCLF to take in additional waste from other counties if it wished to maintain a balanced operating budget. This, in turn, would increase truck traffic which, as previously noted, is the chief nuisance associated with the CCLF.
The foregoing options are not only financially prohibitive in and of themselves, but would also result in an additional cost upon county taxpayers because the current landfill, when filled to capacity, would require monitoring for many years to come.
The CCLF opted for expansion. Such an alternative is easily the most cost-effective option, especially since it would seek to expand an already existing use of the land and facility. It is important to note that the CCLF would only be “expanded” in the sense that its lifetime would be extended. In other words, expansion would not increase its scope of operations or result in increased truck traffic; rather, it would enable the facility to provide its current services for another 20 to 30 years.
In March 2010, the County filed an application with the DEC to extend the life of the CCLF beyond 2017. The so-called “Phase IV expansion” is a proposal for a lateral extension, i.e., *486 new landfill cells would be constructed adjacent to, as opposed to on top of, ones already in use. The new cells would be spread over approximately 53 acres and would not increase the height of the landfill.
In October 2010, the DEC designated itself as the lead agency under the State Environmental Quality Review Act (SEQRA) and declared the expansion to be a Type I action, meaning that Phase IV had the potential for adverse environmental impacts. The DEC then undertook a lengthy environmental review process, which included reviewing draft and/or supplemental environmental impact statements (EIS) and public scoping of the same. The DEC also held a public statement hearing on March 4, 2015. DEC staff reviewed the comments submitted after the hearing—including claims made by the Town that the CCLF is located in a seismically sensitive area and is in dangerously close proximity to a principal aquifer and/or primary water supply aquifer—to determine whether substantive and significant issues were raised within the meaning of regulations that implement the Environmental Conservation Law.
The DEC accepted the County’s final supplemental EIS in August 2015 and concluded its SEQRA review—a process which took five years to complete and which resulted in an administrative record in excess of 5,000 pages—by issuing a findings statement on October 7, 2015. The eight-page findings statement discusses the salient points of the final EIS, including potential impacts to land, wetlands, fish, storm and surface waters, wildlife and habitat, groundwater, air quality, noise, traffic, historic sites and public health. The findings statement also describes the range of alternatives that were considered. The DEC concluded that environmental impacts identified in the final EIS would be minimized or avoided by the conditions imposed by its eight permits and approved the Phase IV expansion.
The foregoing environmental review process was paralleled by a markedly less scientific but nonetheless revealing political process.
Prior to being elected Chautauqua County Executive in 2014, Vince Horrigan represented the Town’s citizens on the Chautauqua County Legislature. In that capacity, Horrigan regularly attended Ellery Town Board meetings and hosted at least five town hall meetings, where the proposed Phase IV expansion was discussed. Once elected County Executive, Horrigan hosted *487 or attended seven more meetings with Town officials regarding the project. The principal and virtually exclusive complaint raised by Town officials was the absence of a hosting fee agreement. In other words, the Town’s dominant concern consistently has been how much it should be financially compensated for agreeing to accept the CCLF within its borders. The County and Town did not come to an accord regarding hosting fees.
On November 18, 2015, the Chautauqua County Legislature passed Resolution No. 221-5 (2015), which approved the bonding required to finance the Phase IV expansion. The Town Board enacted Local Law No. 3 (2015) of Town of Ellery, the following day. The ordinance essentially prohibits the Phase IV expansion.
The Town commenced this litigation on January 28, 2016 by filing a hybrid CPLR article 78 petition and declaratory judgment action against the DEC and the County. By its amended petition and complaint, filed on April 13, 2016, the Town advances four causes of action, which seek to annul the DEC’s findings, void the DEC permits and enjoin the Phase IV expansion. The Town broadly contends that the findings and determinations of the DEC were made in an arbitrary, capricious and unlawful manner. The DEC and County broadly contend that the DEC’s decisions and findings were rational and the issuance of permits lawful.
The County also filed a counterclaim against the Town, seeking a declaration that Local Law No. 3 is preempted by County Law § 226-b. The Town contends that Local Law No. 3 is not preempted by County Law § 226-b and/or that the court must hold a hearing and apply the immunity balancing test, as called for in Matter of County of Monroe (City of Rochester) (72 NY2d 338 [1988]).
A Monroe hearing was conducted over three days in mid-July and much of the salient and credible testimony is summarized above. The Town—even though the purpose of a Monroe hearing is to elicit facts regarding competing public interests in a land use dispute—pursued a strategy that seemed focused on showing that its theories regarding latent environmental peril are sound and genuinely held.
A geology professor, specializing in what he described as, “the art, not science” of seismic interpretation (Jacobi tr at 55), opined there is “strong potential” for faults in the Ellery, New York area and that “additional testing investigation” should be undertaken to determine whether these suspected faults could *488 be “seismically capable” (Jacobi tr at 39). Admitting there has never been a known earthquake in the Ellery area, the professor nevertheless predicted that a “small event” or “tiny earthquake” registering 1.5 to 2.5 on the Richter scale (i.e., one that is detectable by scientific instruments but rarely felt) is “likely” sometime in the next 250 years. When asked whether such an earthquake would compromise the CCLF, the witness answered: “Generally no. But I’m not an engineer” (Jacobi tr at 57). The Town’s environmental consultant and engineering expert testified there is no evidence that the CCLF is in an earthquake zone and no evidence that the proposed expansion of the CCLF would compromise an aquifer (Battaglia tr at 267).
The parties’ post-hearing briefs were received on September 14, 2016. The court’s decision is as follows.
The Town’s Article 78 Petition and Declaratory Judgment Action
As previously noted, the Town contends that the permits authorizing the Phase IV expansion should be annulled and vacated. The Town alleges, inter alia, that the DEC failed to conduct a full adjudicatory hearing to review substantive and significant environmental issues, namely, whether the landfill is in a seismically sensitive area and whether it is dangerously close to a principal aquifer and/or primary water supply aquifer. The Town also alleges that the DEC did not take a “hard look” at other deleterious environmental impacts, like noise and the landfill’s effect upon a bald eagle habitat. Respondents contend, inter alia, that the DEC’s decisions and findings were rational and the issuance of permits lawful; that the Town misapprehends the appropriate procedure for handling a substantive and significant issues claim; and that the DEC took the required hard look at the Town’s other environmental concerns. The dispute, at its core, centers upon whether the procedural and substantive requirements of the ECL and/or SEQRA have been met.
SEQRA (which is codified within the ECL) requires governmental authorities to consider whether an “action,” such as the expansion of a landfill, will have a significant impact upon the environment. The statutory scheme prohibits approval or funding for an action unless and until an adequate environmental review has been performed. In reviewing administrative proceedings in general and SEQRA determinations in particu *489 lar, it is not the role of the court to weigh the desirability of any action or to choose among alternatives, but to assure the agency itself has satisfied SEQRA, procedurally and substantively (Matter of Jackson v New York State Urban Dev. Corp., 67 NY2d 400, 416 [1986]; also see Scott v City of Buffalo, 20 Misc 3d 1135[A], 2008 NY Slip Op 51738[U] [Sup Ct, Erie County 2008], affd 67 AD3d 1393 [2009]).
SEQRA sets forth a number of statutory procedures governing how a lead agency should evaluate a proposed Type I action (see ECL 8-0109 et seq.; New York SMSA Ltd. Partnership v Town of Riverhead Town Bd., 118 F Supp 2d 333, 335-336 [2000]; Lucas v Planning Bd. of Town of LaGrange, 7 F Supp 2d 310 [1998]). Generally, a draft EIS is prepared and, after a comment period and any public hearings deemed necessary by the agency, is reevaluated to determine in what way, if any, the EIS should be revised or supplemented so as to adequately address issues raised by the comments. The agency then files a final EIS and, after a final comment period and any appropriate public hearings, the agency must make express findings that SEQRA’s requirements have been met (Akpan v Koch, 75 NY2d 561, 569 [1990]).
The DEC must determine, as part of this process, whether public hearings should be conducted. Such a determination shall be based on whether the DEC’s evaluation of an application or public comments raise substantive and significant issues relating to any findings or determinations the DEC is required to make (ECL 70-0119 [1]). Should a public hearing be necessary, it must be held as provided in the rules and regulations adopted by the DEC (ECL 70-0119 [5]).
Pursuant to DEC regulations, the public hearing may be either “adjudicatory” (i.e., a trial-like proceeding) or “legislative” in nature (6 NYCRR 621.8 [a]). The regulations also provide, “[t]he determination to hold an adjudicatory . . . hearing shall be based [upon] whether the department’s review raises substantive and significant issues relating to any findings or determinations the department . . . ma[d]e pursuant to the Environmental Conservation Law” (6 NYCRR 621.8 [b] [emphasis supplied]). Rationally made decisions regarding whether such issues genuinely exist and whether a full adjudicatory hearing is warranted are reserved for the DEC (see Matter of Gracie Point Community Council v New York State Dept. of Envtl. Conservation, 92 AD3d 123 [2011]; Matter of Eastern Niagara Project Power Alliance v New York State Dept, of Envtl. Conser *490 vation, 42 AD3d 857 [2007]). Consequently, the role of the court is not to decide whether the CCLF is sited in an earthquake zone or dangerously close to an aquifer; rather, it is to determine whether the Town’s claims were properly considered by the DEC.
The DEC followed all of the appropriate environmental review procedures as summarized above. With respect to its decision to decline holding a full adjudicatory hearing, the DEC essentially concluded that the Town’s earthquake zone and aquifer proximity claims were unproven and dubious theories, instead of substantive and significant issues. Such a conclusion was made rationally and its soundness appears to be supported by the testimony of the Town’s experts at the Monroe hearing. Thus, the DEC’S decision to proceed with a public statement hearing, instead of holding a full adjudicatory hearing, was a provident exercise of its administrative discretion.
Turning to the question of assessing the DEC’S compliance with the substantive mandates of SEQRA, the court must review the record to determine whether the agency identified the relevant areas of environmental concern, took a hard look at them, and made a reasoned elaboration for its determination. Judicial review of such decision-making is governed by the rule of reason and agencies are given considerable latitude in evaluating environmental effects. It is the responsibility of the lead agency to comb through reports, analyses and other documents before making a determination, and it is not for a reviewing court to duplicate these efforts. While judicial review must be meaningful, is it not the province of the court to second-guess thoughtful agency decision-making and the court may not substitute its judgment for that of the agency. An agency decision should be annulled only if it is arbitrary, capricious or unsupported by the evidence. (See Matter of Riverkeeper, Inc. v Planning Bd. of Town of Southeast, 9 NY3d 219, 231-232 [2007]; Akpan v Koch, 75 NY2d 561, 570 [1990]; Matter of Hallenbeck v Onondaga County Resource Recovery Agency, 225 AD2d 1036 [1996].)
Like its other claims, there is little if any actual evidence supporting the Town’s claim that a bald eagle habitat exists at the CCLF. Because the Phase IV expansion will not increase the volume of trash being received at the facility, there is also little, if any, merit to the claim that truck traffic will increase and result in significantly more noise.
*491 It is readily apparent that the DEC took the requisite hard look at the Town’s claims and made a reasoned elaboration for its determinations. Because the Town might disagree with the conclusions of the DEC does not mean that its environmental review was arbitrary and capricious. Indeed, the record amply demonstrates that the agency’s decision-making was thoughtful and supported by the evidence. Accordingly, the DEC complied with its substantive and procedural obligations under the ECL and SEQRA.
The County’s Counterclaim and Declaratory Judgment Action
As previously noted, the County also has filed a counterclaim against the Town, seeking a declaration that Local Law No. 3 is preempted by state law (i.e., County Law § 226-b), or that in the absence of preemption, the County and the CCLF are immune from the ordinance. More simply stated, the County contends the Town lacks the legal authority to regulate a landfill operated by a county and already regulated by other government agencies, including the DEC. The Town contends that it has such legal authority and, to the extent there are competing public interests, the balancing of them weighs in its favor.
A locality is empowered to adopt local laws or ordinances as long as they are not inconsistent with state law (NY Const, art IX, § 2 [c]; Municipal Home Rule Law § 10 [1]). Conversely, an ordinance is unenforceable when it is inconsistent with, or “preempted” by, state law. An ordinance will be preempted either where the legislature has indicated its intent to occupy the particular field (field preemption) or where there is a direct conflict with a state statute (conflict preemption). Conflict preemption occurs when the ordinance prohibits what would be permissible under state law or imposes prerequisite additional restrictions on rights under state law so as to inhibit the operation of the state’s general laws (see Eric M. Berman, P.C. v City of New York, 25 NY3d 684, 687 [2015]; Consolidated Edison Co. of N.Y. v Town of Red Hook, 60 NY2d 99, 107 [1983]).
No state laws—including the ECL and its rules and regulations—expressly preclude the right of localities to adopt local ordinances affecting landfills. Nor can field preemption be implied in this case (see People v Diack, 24 NY3d 674, 679 [2015]). The question therefore remaining is whether Local Law No. 3 is in direct conflict with state law.
*492 County Law § 226-b authorizes a county to construct a solid waste landfill so long as it takes local land use character and zoning regulations into “consideration.” The statute does not grant a municipality located within a county the authority to prohibit the construction or expansion of a landfill. County Law § 226-b is specifically intended to provide for the collection and disposition of solid wastes as a county function (Riley v County of Monroe, 43 NY2d 144, 149 [1977]). Although a county must consider local land use regulations before deciding where a landfill is sited, it is not bound by them (see 1993 Atty Gen [Inf Ops] 1070; 1981 Atty Gen [Inf Ops] 140). It should be noted that there is no claim made that the County failed to take such local interests and regulations into consideration when the CCLF was originally sited.
Pursuant to Local Law No. 3 § III-l, “The Town Board by this Local Law intends to: . . . Prohibit the permitting, construction, expansion and operation of solid waste management facilities within the Town of Ellery.” Pursuant to Local Law No. 3 § II, the ordinance is premised upon the so-called “findings” of a five-member town board—in contrast to the findings of an agency whose raison d’etre is to enforce laws and regulations designed to protect the environment—that “environmental science is presently inadequate to satisfactorily evaluate and control pollution from solid and liquid waste disposal facilities, such as landfills.”
Pursuant to Local Law No. 3 § VIII-1, “The sale, acquisition, land application, storage, handling, treatment, recycling, disposal and/or processing of Solid Waste within the Town of Ellery is prohibited.” Pursuant to section VIII-3, “No existing Solid Waste Management Facility shall thereafter be expanded, or permitted to expand within the Town of Ellery.”
Local Law No. 3 § IX grants any existing waste management facility in the Town (i.e., the CCLF) the option to apply for a “Special Exception Permit” if certain conditions and procedures—set forth in excruciating detail in IOV2 typed, single-spaced pages—are met. Compliance with section IX, which is by far the lengthiest section of the ordinance, is unachievable unless the County agrees to perform a myriad of additional tasks to the satisfaction of the Town Board. For added measure, section X makes any violation of Local Law No. 3, or of any of its regulations or provisions, a criminal offense, punishable by up to one year of imprisonment.
Obviously dissatisfied by the EEC’s findings and determinations, and likely dissatisfied with the lack of a hosting fee *493 agreement, the Town Board clearly intends to halt the Phase IV expansion and enacted Local Law No. 3 with this purpose in mind. Indeed, its stated purpose is to prohibit the construction and expansion of any landfill in the Town of Ellery. Such a declaration is not merely restrictive in nature. Nor is Local Law No. 3 merely an “ordinary zoning ordinance,” as is urged by the Town. Rather, Local Law No. 3 explicitly prohibits that which is permissible under state law and has been permitted pursuant to state law. Additionally, Local Law No. 3’s requirements for the issuance of a special exception permit are virtually impossible to meet. As such, they constitute prerequisite additional local restrictions inhibiting the operation of state law.
State law only requires the County to consider local land use laws and regulations. Local Law No. 3, by contrast, requires the County to acquiesce to the Town’s land use laws and regulations. The Ellery Town Board’s gambit to grant unto itself ultra vires regulatory authority and veto power over the lawful actions of the Chautauqua County Legislature clearly frustrates the County’s ability to exercise its powers and carry out its responsibilities under state law.
For all of the foregoing reasons, Local Law No. 3 is in direct conflict with, and thus preempted by, state law.
Assuming, arguendo, that Local Law No. 3 is not preempted by state law, the court must apply the immunity balancing test, i.e., weigh the competing public interests of the County and the Town to determine whether the County and the CCLF are immune from the ordinance. In so doing, the following factors should be considered: the nature and scope of the instrumentality seeking immunity; the kind of function or land use involved; the extent of the public interest to be served thereby; the effect the local land use regulation would have upon the enterprise concerned; the impact of the local land use regulation on legitimate local interests; the applicant’s legislative grant of immunity; alternative locations for the facility in less restrictive areas; alternative methods for providing the needed improvement; and interdepartmental participation in the project development process. One factor in the calculus could be more influential than another or may be so significant as to completely overshadow all others but no element should be thought of as ritualistically required or controlling. (See Matter of County of Monroe [City of Rochester], 72 NY2d 338, 343 [1988]; Matter of County of Herkimer v Village of Herkimer, 51 Misc 3d 516, 532 [2016]).
*494 The nature and scope of the instrumentality in question is a landfill that is regulated by federal and state agencies. The land use involved is an expansion of one already in existence for 35 years. The public interest to be served is the continuation of an environmentally sound and cost-effective means of managing waste.
The effect of the local land use regulation upon the enterprise concerned would be oversight by a hostile Town Board under a duplicative (at best) local licensing system, which encroaches upon the regulatory authority of the DEC and subjugates an already rigorous and often complex environmental review process (as well as judicial review of the same) to the vote of the same Town Board. The impact of the local land use regulation on local interests would likely be the cessation of the CCLF’s operations and a reduction in local truck traffic.
The applicant’s legislative grant of authority is County Law § 226-b, which is specifically intended to provide for the collection and disposition of solid wastes as a county function. Regarding alternative locations in a less restrictive zoning area, the CCLF is already located in the Town’s least restrictive zoning area. Alternative methods for providing the needed improvement are extraordinarily expensive and there is little if any evidence to suggest that choosing such an alternative would make the environment safer. Regarding intergovernmental participation in the project process, the DEC’s five-year-long environmental review afforded the Town and others multiple opportunities to be heard and there were at least seven meetings between Town and County officials regarding the Phase IV expansion.
In sum, most if not all of the Monroe factors, when considered individually, weigh in the County’s favor. The scales weigh heavily in the County’s favor when all the factors are considered collectively. The County and the CCLF are thus immune from Local Law No. 3.
Conclusion
Pursuant to CPLR 3001, the court declares the rights and other legal obligations of the parties, with respect to the matters in controversy, to be as follows: (1) the DEC has satisfied the requirements of the ECL and SEQRA, both procedurally and substantively; (2) all determinations and findings of the DEC were rationally made; (3) the issuance of permits by the DEC was lawful in all respects; (4) Local Law No. 3 is *495 preempted by state law and is therefore null and void; (5) the County and the CCLF are otherwise immune from Local Law No. 3; and (6) the CCLF Phase IV expansion, as it stands and without further municipal approval, is legally permissible.
The relief requested by the County is granted, the relief requested by the Town is denied and the Town’s amended petition and complaint are dismissed.